UNITED STATES

v.

**Airman John J. JOHNSON, Jr., FR 546–29–4390 United States Air Force.**

**ACM 23556.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 12 March 1982.

Decided 21 Jan. 1983.

Appellate Counsel for the Accused: Colonel George R. Stevens and Major Richard A. Morgan.

Appellate Counsel for the United States: Colonel Kenneth R. Rengert and Major Michael J. Hoover.

Before KASTL, RAICHLE and SNYDER, Appellate Military Judges.

## DECISION

KASTL, Senior Judge:

Airman Johnson stands before us convicted of sabotage of two RF–4 aircraft in violation of 18 U.S.C. 2155, willful damage to military property of the United States, and aggravated arson, in violation of Articles 134, 108, and 126, U.C.M.J., 10 U.S.C. §§ 934, 908, and 926. The accused was tried by general court-martial. He pleaded guilty to willfully damaging one RF–4 aircraft, in violation of Article 108, U.C.M.J. He pleaded not guilty to all other offenses charged. He was sentenced by a court consisting of members to a dishonorable discharge, confinement at hard labor for 30 years, total forfeitures, and reduction to airman basic. The convening authority approved the sentence except for reducing the period of confinement to 20 years.

We disapprove the convictions for sabotage, approve the remaining findings, and reassess the sentence.

### I

■ The accused avers that the evidence is insufficient to support a conviction for sabotage, under 18 U.S.C. 2155. The evidence reflects that on 8 September 1981, the accused deliberately placed a bolt in the air intake of the number two engine of aircraft 66–397 just prior to engine start. During the same day, he placed a similar bolt in either the forward engine bay or the variramp of aircraft 66–457. The bolt was ingested into the number two engine while the aircraft was airborne. Damage to each aircraft was in excess of $26,000.00. After reviewing the legislative history and the limited case law available, we agree with the accused.

Section 2155 reads, in pertinent part:

(a) *Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States,* willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any national-defense material, national-defense premises, or national-defense utilities, shall be fined not more than $10,000 or imprisoned not more than ten years, or both (emphasis added).

In light of this clear-cut standard, we have considered the facts of the case, and weighed the accused's frame of mind as explained in the record: "I was angry; I

was upset. I was thinking about all of my problems that I had. But I had no intentions whatsoever to interfere with or destruct the national defense—no intentions whatsoever."

*Intent* is the crucial factor. Under the circumstances, we are not persuaded that the accused intended sabotage. As the Court of Military Appeals clearly stated in *United States v. Stewart,* 19 U.S.C.M.A. 417, 42 C.M.R. 19, 21 (1970):

> unless the necessary intent to commit sabotage can be reasonably inferred from the fact of the act itself, the accused's conviction must fall for lack of sufficient evidence.

*See also United States v. Reyes,* 30 C.M.R. 776 (A.F.B.R.1960), *pet. denied,* 30 C.M.R. 417.

In a thoughtful dissent, Judge Snyder has researched this matter extensively. Simply put, we disagree with his conclusion that sabotage is proved here.

Several points must be made.

First, authority is scant. No one has ever been successfully prosecuted under this precise statute. Neither civilian nor military case law in the 60-odd years since the statute was originally passed appears to support the dissenting position; thus, each of the military precedents must be laboriously distinguished. The legislative history is opaque and confusing, at best.

Second, convictions under similar statutes, such as 18 U.S.C. 2153(a), are inapposite. *United States v. Achtenberg,* 459 F.2d 91, 98 (8th Cir.1972). This is so because Section 2153(a) contains an additional clause for time of war/national emergency—absent in prosecutions such as the present one in peacetime—permitting a conviction upon a different and less strict basis. That clause provides:

> (a) *Whoever,* when the United States is at war, or in times of national emergency as declared by the President or by the Congress, *with intent to injure,* interfere with, or obstruct the United States or any associate nation in preparing for or carrying on the war or defense activities, *or*

*with reason to believe that his act may injure, interfere with, or obstruct the United States* or any associate nation in preparing for or carrying on the war or defense activities willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any war material, war premises, or war utilities, shall be fined not more than $10,000 or imprisoned not more than thirty years, or both (emphasis added).

*See United States v. Bishop,* 555 F.2d 771 (10th Cir.1977); *United States v. Achtenberg, supra. See also Gorin v. United States,* 111 F.2d 712 (9th Cir.1940); *United States v. Melville,* 309 F.Supp. 774, 780 (S.D. N.Y.1970). *See generally* Annot., 24 A.L.R. Fed. 906 (1975).

■ Although we find the accused not guilty of sabotage, we find that he clearly violated Article 108, U.C.M.J., willful damage to government property. This is a lesser included offense of sabotage. *United States v. Reyes, supra,* at 782–783.

■ We find the accused guilty of this lesser included offense and dismiss the sabotage offenses. We believe that the defense argument that the sabotage and Article 108 offenses are multiplicious for *charging* purposes need not be addressed. The accused did not object at trial that one transaction had been made the basis for an unreasonable multiplication of charges. See para. 26*b,* M.C.M., 1969 (Rev.). Moreover, there may have been doubt in the minds of the trial participants as to whether *Reyes*—which holds willful damage under Article 108, U.C.M.J. to be a lesser included offense of sabotage—was still good law. In any event, we perceive no harm to the accused. *See generally United States v. Baker,* 14 M.J. 361, 365 (C.M.A. 1983); *United States v. Stegall,* 6 M.J. 176, 177–178 (C.M.A.1979).

Furthermore, since the military judge indicated that the offenses would be considered multiplicious for *sentencing,* the sentence was unaffected by this matter. *See generally United States v. Fortney,* 12 M.J. 987, 989 (A.F.C.M.R.1982); *United States v. Huggins,* 12 M.J. 657 (A.C.M.R. 1981).

## II

■ The accused also claims that the evidence is insufficient to support a conviction of aggravated arson since he lacked the capacity to form the specific intent required, due to intoxication. At trial, the accused's defense was not that he was too drunk to form a specific intent, but that he did not set the fire. Indeed, the defense was that another person caused the fire by throwing something that would start a fire through the accused's barracks room window; the claimed motive was hostility towards the accused for the extra work resulting from his having damaged the aircraft.

We approve the findings of guilt as to aggravated arson. Two witnesses testified that the accused appeared highly intoxicated. However, both witnesses engaged the accused in lucid conversation prior to the fire. Evidence further reflects that the accused was cognizant of everything occurring; for example, he immediately responded to being tapped on the leg; his response to a fire chief's order to depart the room was immediate; and he required no assistance to leave. In summary, we are convinced beyond peradventure that the accused had the capacity to entertain the necessary intent.

## III

■ The accused states that certain evidence taken from his room on the night of the fire should have been suppressed. Fire and investigative officials were properly present in the room after responding to extinguish a fire there and discovering the accused, a possible casualty, lying down on the bed. Having responded, they maintained constant control over the room. During the period of control, the evidence was discovered. The record reveals that the investigator had lifted the mattress as the first step in lifting the box spring to see if there were broken glass fragments under the bed. When the mattress was lifted, the investigator saw a pair of damp white socks, and noted the strong odor of an accelerant apparently emanating from the socks. Subsequent laboratory analysis showed the socks saturated with a petroleum distillate.

The investigator was pursuing the purpose of the original response and his actions were reasonably within that purpose. Therefore, we hold that the socks were properly admitted into evidence. *See Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *United States v. Smeal,* 23 U.S.C.M.A. 347, 49 C.M.R. 751 (1975).

## IV

The accused argues that the convening authority erred by not considering clemency matters presented by the accused's parents after that convenor promulgated his action. Similarly, the defense requests that we either permit such documents to be filed with this Court or, in the alternative, remand the case to the convening authority for consideration of same and a new action.

■ We decline to accept the documents. *United States v. Castleman,* 10 M.J. 750 (A.F.C.M.R.1981). Furthermore, we believe the convening authority to have been without authority to take further action because the accused was no longer assigned within his command. Paragraph 12–2e, Air Force Manual 111–1, Military Justice Guide, 2 July 1973. The proffered documents will be returned to the appellate defense counsel who may, if deemed advisable, forward them to The Judge Advocate General for clemency consideration. Article 74(a), U.C. M.J., 10 U.S.C. § 874(a); paragraph 12–2d, Air Force Manual 111–1, Military Justice Guide, 2 July 1973.

## V

The accused also claims that he is entitled to a credit for illegal pretrial confinement. We agree. *United States v. Lynch,* 13 M.J. 394 (C.M.A.1982); *United States v. Pettersen,* 14 M.J. 608 (A.F.C.M.R.1982).

## VI

■ We now turn to sentence reassessment. We disapprove findings of guilty as to sabotage. We approve findings of guilty

as to willful damage to government property and aggravated arson. We approve only so much of the sentence as extends to a dishonorable discharge, confinement at hard labor for 12 years, forfeiture of all pay and allowances, and reduction to airman basic.

The findings of guilty and the sentence, as modified, are

AFFIRMED.

RAICHLE, Judge, concurs.

SNYDER, Judge, (concurring in part and dissenting in part):

The majority has decided that the evidence is insufficient to establish the requisite intent to interfere with the national defense of the United States (hereinafter referred to as sabotage). I respectfully dissent from that conclusion.

Very few of the facts of this case are contained in the majority opinion. Therefore, I feel it essential to set forth what I believe to be the evidence of record as it relates to the issue of intent.

At the beginning of his shift, the accused was directed to report to his squadron commander where he received a letter of reprimand and then returned to duty (It was the reprimand that led to the accused's claimed emotional state which is referenced in the majority opinion). While acting as a fireguard, the accused placed a small bolt into the air intake of aircraft 66–397 immediately prior to engine start. The bolt was ingested into the number two engine after the engines were started. The crew chief caused the engines to be shut down after observing sparks.

The evidence reflected that the accused acted as supervisor of aircraft 66–457's refueling (I conclude that he was the supervisor because he signed the document as the person correcting the "refueling discrepancy"). Due to an unrelated problem, aircraft 66–457 received two preflight foreign object damage (FOD) inspections with negative results. After its second mission, the pilot advised that, after becoming airborne, he heard a thump after disengaging the afterburner. The crew chief discovered damage to the number two engine.

An expert witness testified that any object in the air intake would have been ingested into the engine while the aircraft was still on the ground, which was consistent with the preflight FOD inspections not discovering any foreign objects. He added that, because of their inaccessibility with the engine installed, applicable directives do not require inspection of the engine bay or the variramp. This fact, combined with the damage occurring in flight, led the expert witness to conclude that the bolt came from either the forward engine bay or the variramp. He testified that a person in the wheelwell (where one of two switches must be activated during refueling) is only two and one-half to three feet from the auxiliary air doors (through which one has access to the engine bay and variramp).

Although a number of issues are intertwined, one of the crucial questions of this case may, in my opinion, be stated as follows:

For purposes of 18 U.S.C. 2155, do the words "with intent to injure, interfere with, or obstruct the national-defense ..." reflect a congressional intent that the inference of holding one responsible for the probable consequences of a willful act be inapplicable?

The consequences of the accused's willful acts of damage were indisputable. A unit with a combat mission was without the service of two combat reconnaissance aircraft for a substantial period of time and, had the need arisen, would have deployed without them (aircraft 66–457 was still out of service at the time of trial). It hardly requires stating that those consequences did, in fact, interfere with the national defense. Even the majority concedes that objective fact. That notwithstanding, however, the majority concludes that the statute precludes the accused being held accountable because he was not "thinking sabotage at the time of his actions" (my phraseology).

My review of the legislative history and the scarce precedents leads me to conclude

otherwise. *United States v. Stewart,* 19 U.S.C.M.A. 417, 42 C.M.R. 19 (1970), is the only published case, military or civilian, to take final appellate action on a conviction of violating section 2155.[1]

In *Stewart, supra,* the accused was convicted of attempting to interfere with the national defense of the United States by attempting to willfully damage an aircraft. To avoid another cruise to the Mediterranean, the accused decided to damage an aircraft and threw a pipe and chain into the air intake to effect his plan. He did so with another sailor present and in the distant view of an officer (the accused mused aloud if the officer saw him put the objects in the intake), and he related his act to two other sailors. The defense argued that his only intent was to avoid another cruise, not sabotage. The Government argued that avoiding another cruise was his motive, not his intent. After reviewing the evidence, the Court framed the issue and concluded the following:

> However, unless the necessary intent to commit sabotage can be reasonably inferred from *the fact of the act itself,* the accused's conviction must fall for lack of sufficient evidence . . . . . It is apparent

that had the accused been intent on interfering with the national defense of the United States he would have acted in a more surreptitious manner and not so openly. (emphasis added)

*United States v. Stewart, supra,* 21–22. Thus, the Court tacitly held that, under the facts of that case, the crucial intent could not be inferred merely from the act itself.

The decision specifically agreed with the dissenting opinion in the Navy Board of Review's decision and cited a prior unpublished Navy case, *United States v. Meeker,* NCM 63–00102 (N.B.R. April 19, 1963)[2], as authority for its holding. The Board's reliance on *United States v. Reyes,* 30 C.M.R. 776 (A.F.B.R.1960), pet. denied, 30 C.M.R. 417 (1960)[3], was deemed to be misplaced without specific explanation for that conclusion.

The Court's opinion did not contain any discussion or reference to the legislative history of the statute. It noted, however, the absence of civilian cases involving the statute.[4] Thus, a brief review of the legislative history is in order.

The precursor of section 2155 is the Act of 20 April 1918 (hereinafter referred to as

---

1. The Navy Board of Review (later Court of Military Review) has decided two cases involving section 2155, *Stewart* being one of them. Our predecessor Board of Review decided one case involving the statute but resolved the case on other grounds. *See United States v. Reyes,* 30 C.M.R. 776 (A.F.B.R.1960), pet. denied, 30 C.M.R. 417 (1960), which will be discussed in a subsequent note.

2. In *United States v. Meeker,* NCM 63–00102 (N.B.R. April 19, 1963), the accused tossed an empty cigarette package into the air intake of an aircraft while on the midnight shift of guard duty. After accidentally kicking his flash light, he placed the spring (which had separated from the plastic end) in another aircraft's intake, and the plastic end in a third aircraft's intake. The objects were discovered the next morning during preflight inspection. The Board accorded more weight to the testimony which opined the objects would not have caused damage even had they not been discovered.

3. *United States v. Reyes, supra,* involved a situation where the accused was posted as an aircraft guard during night shift. To call attention to a lack of security on the flight line and his

lack of training, he cut a number of wires on a B–52 aircraft. The damage was not discovered until the accused pointed it out some days later. Our predecessor Board commented that, applying a test of legal sufficiency (the test applied by appellate courts without factfinding authority), there was sufficient evidence from which the court members could have inferred that the accused had the necessary intent. It refused to make that finding of fact, however, because of an instructional error and because defense counsel's cross-examination on the mission of the damaged aircraft was prejudicially foreclosed. Consequently, the included offense of willfully damaging military property in violation of Article 108, U.C.M.J., was approved. Thus, one probable reason for the Court's conclusion that the Navy Board's reliance was misplaced, was our predecessor's refusal to make the finding of fact.

4. Protests of the Viet Nam War resulted in prosecutions under section 2153 subsequent to *Stewart. See e.g., United States v. Bishop,* 555 F.2d 771 (10th Cir.1977); *United States v. Achtenberg,* 459 F.2d 91 (8th Cir.1972).

the Act) [5] 40 Stat. 533 (1918). The Act was passed to punish the willful injury or destruction of war materials, or of war premises or utilities used in connection with war materials. It was meant to provide a means for federal prosecution for malicious destruction of or damage to property affecting the Government's war effort. It required a willful destruction or damage to war premises, etc., with the specific intent to injure or interfere with the war effort, or reason to believe that the destruction or damage would cause such injury or interference. The Act was, by its plain language, limited to World War I.

The Act became known as the "Sabotage Act", which was, and is, in my opinion, a misnomer. It is a misnomer because the term "sabotage" usually causes one to envision enemies of the nation surreptitiously lurking about and inflicting damage or destroying defense materials or structures (usually by explosives).[6] Moreover, foreign insurgents were not Congress' chief concern when the Act was enacted. Although there was some concern over foreign agents, Congress' main concern was the potential adverse impact of possibly violent work stoppages on the nation's ability to move supplies and armaments to port for shipment to the American Expeditionary Force. The sharpest debate concerned whether the bill, if passed, would affect the right to strike.[7] A more appropriate title would be Protection of Defense Properties and Utilities, because there was no indication that Congress intended that a perpetrator's motive be controlling. The portion of the discussion on the floor of the House of Representatives set forth below is illustrative.

Mr. Meeker. Suppose, for illustration, there is a strike, and incidental to the strike trouble that is going on war materials are destroyed. Would this bill reach that case?

Mr. Caraway. Incidental may mean anything. If a man incidentally destroys property in his pursuit of a lawful end in a lawful manner as an incident of the strike, he is not guilty, but if in asserting his right to strike he should willfully and intentionally destroy property that was necessary for the Government to carry on this war he would fall within the provision of the bill, and be punished under it.

\*　　\*　　\*　　\*　　\*　　\*

Mr. Reaves. No matter what his intent was, his intent might be to injure the railroad company or to get even with some enemy, but acting under that intent if he has reasonable cause to believe that the consequences of his act are an injury to the United States he comes under the provisions of the bill?

\*　　\*　　\*　　\*　　\*　　\*

Mr. Caraway. Of Course.

56 Cong.Rec., Pt. 3, 3109, 3117 (1918).

In 1940, there was felt to be a need to extend the protection of the Act to periods of emergency short of actual war. Therefore, the Act was amended. The amend-

---

**5.** The actionable portion of the Act was section 2, which is set forth below. When Title 18 of the United States Code was promulgated, section 2 became section 2153 (which is applicable only during time of war or national emergency) with no change in wording. Subsequent amendment made it applicable in time of emergency as well:

   Sec. 2. That when the United States is at war, whoever, with intent to injure, interfere with, or obstruct the United States or any associate nation in preparing for or carrying on the war, or whoever, with reason to believe that his act may injure, interfere with, or obstruct the United States or any associate nation in preparing for or carrying on the war, shall willfully injure or destroy, or shall attempt to so injure or destroy, any war material, war premises, or war utilities, as herein defined, shall upon conviction thereof, be fined not more than $10,000.00 or imprisoned not more than thirty years, or both.

**6.** Before the Navy Board of Review, appellate defense counsel argued that the Act was intended to reach enemies of the nation; to punish those who destroy or damage defense materials in a spirit of treason, disloyalty, or treachery. *See United States v. Stewart,* NCM 69–1800 (N.C.M.R. August 15, 1969). A review of *United States v. Bishop* and *United States v. Achtenberg,* both *supra* at n. 4, for example, supports a broader application. Those cases involved American citizens protesting the Viet Nam War.

**7.** *See* 56 Cong.Rec., Pt. 3, 3109, *et seq* (1918).

ment deleted the word "the" from immediately in front of the word "war" in the last line of the opening paragraph of the Act (which made the Act applicable to any war rather than solely to World War I), added three new sections, and made the Act applicable to the Philippine Islands, the Panama Canal Zone, and all other United States Territories. 54 Stat. 1220 (1940).[8] The following event is crucial to the case *sub judice* (and any other case tried under section 2155).

The bill, as drafted by the Department of Justice, went to both houses of Congress with the words "... or whoever with reason to believe..." in the second clause of the proposed section 5, which would have been identical to the Act except for peace time application. They were deleted by the Senate, however, as was the restriction to times of presidentially declared emergency. The version without those words was the one eventually enacted into law. There have been subsequent amendments, but they are not germane to the issue.

The majority concludes that, because those words were deleted from what became section 2155, a factfinder may not infer the necessary intent from a willful act and the probable consequences therefrom. Such a construction creates, in my opinion, a super specific intent crime. Although sabotage is a specific intent crime, it is provable the same as any other specific intent crime. The majority's position renders it practically impossible to obtain a conviction absent a confession or membership in a subversive organization.

Although it was felt that including the words would ease the Government's burden in a prosecution under the statute, a reading of the entire history reflects that proof of a deliberate act and resulting damage or destruction would meet most of the burden of proof even without the deleted words. *See* 56 Cong.Rec., Pt. 3, 3109–3120 (1918); 86 Cong.Rec. 12789–12792 (1940).

Ironically, we have the situation which the senator who objected to the deleted language sought to prevent. He desired that the statute read as any other criminal statute, and he was concerned that the deleted words would allow convictions for truly innocent or accidental acts.

Mr. Wheeler: It does not make any difference whether or not he intended to do it. If a reasonable man does something, it is a question of fact for the jury to decide. Under this language, if he does it realizing he is doing it for that purpose, he is guilty .... Why undertake to change the language that is ordinarily used in every criminal statute? It might have some false construction put upon it by some foolish ... district attorney ....

86 Cong.Rec., 12791 (1940). The deletion of the words "or whoever with reason to believe ..." does not, in my opinion, preclude the factfinders from inferring that one intends the probable consequences of a willful act, nor does *United States v. Stewart, supra,* require that result.[9]

---

**8.** The applicable portions of the first paragraph of the Act and the applicable portions of the amendment are set forth below. Section 5 of the amendment was the key portion for purposes of this case. It became 18 U.S.C. 2155 when Title 18 was promulgated.

> CHAP. 59.—An Act To punish the willful injury or destruction of war material, or of war premises or utilities used in connection with war material, and for other purposes. ... In connection with the conduct of *the* war.
> To Amend an Act entitled "An Act..." ... The first paragraph of section 1 ... is amended by striking out the word "the" immediately preceding the word "war".

Such Act of April 20, 1918, is further amended by adding at the end thereof the following sections:

> &ast; &ast; &ast; &ast; &ast; &ast;
> Sec. 5. That whoever, with intent to injure, interfere with, or obstruct the national-defense of the United States, shall willfully injure or destroy, or shall attempt to so injure or destroy, any national-defense material, national defense premises, or national-defense utilities, ....

**9.** A reading of the Navy Court of Military Review's majority opinion could indicate that the Court of Military Appeals impliedly rejected this line of reasoning. However, the basis of the dissent and the Court of Military Appeals

In *United States v. Stewart, supra,* the common thread running through it and *Meeker, supra,* is that no damage actually occurred. *Meeker* stated that not only were the objects unlikely to cause damage, but, while assuming the accused placed the objects where the preflight inspection was certain to discover their presence, found the absence of any criminal intent.

The emphasized language from *Stewart, supra,* does not indicate a holding that the accused was not accountable for the probable consequences of his act. Instead, the Court was confining its decision to the specific facts before it. Those facts reflected a complete absence of damage and a *desire that the act be observed and acted upon.* That was also the Court's apparent purpose in keying on the absence of surreptitiousness, not that it was an overriding factor in its decision (one must conclude, however, that the presence of surreptitiousness would certainly suggest the requisite intent).

Interestingly, the majority declines to label the accused's actions as having been done surreptitiously. Black's Law Dictionary, 5th ed., defines surreptitious as "stealthily or fraudulently done." Websters Third New International Dictionary defines the term as "acting in secret or by stealth: doing something clandestinely." In my view, the facts above reasonably support the conclusion that the accused's acts were done in a surreptitious manner.

The Court in *Stewart* emphasized the *absence of damage* and inferred the accused knew he was being watched when he put the objects in the air intake.

. . . [I]t is logical to assume that he was aware of the damage that *could* result if the engine was started prior to removal of the foreign objects.

*United States v. Stewart, supra,* at 22.

I believe the "bottom line" of *Stewart* to be as follows: Since the accused was obviously open in throwing the objects into the air intake and was probably aware that an officer, as well as a fellow sailor (who gave him the objects), observed him do it, the natural and probable consequences of his act were that he would be seen, apprehended, and disciplined. *No damage* would result to the aircraft because prudent officers would not have allowed the engine to be started knowing the objects were therein.[10]

The most probable reason for our predecessor's comment in *United States v. Reyes, supra,* that the evidence was sufficient to support an inference of intent to commit sabotage was the surreptitious infliction of damage which could have prevented the aircraft from safely completing its mission. *United States v. Reyes, supra.*

The accused in the case *sub judice* surreptitiously placed a bolt into the air intake of aircraft 66–397 just before engine start, when there was no opportunity to prevent damage. A similar bolt was surreptitiously placed in an area of aircraft 66–457's interior where it was certain not to be discovered during preflight inspection. It was ingested into the engine while the aircraft was airborne. The aircraft, as well as the crew, possibly may have been lost. The manner in which aircraft 66–457 was damaged reflects cold, deliberate calculation, not a mind befuddled by anger or frustration.

Damage to both aircraft, and the time both were out of service, was substantial. Had the accused's unit been ordered into action, it would have deployed with two

---

acceptance thereof, does not appear to patently conflict with my analysis below.

**10.** It is not my position that discovery of a foreign object which was deliberately implanted (or damage which was inflicted) will always preclude a violation of section 2155. Where the surrounding circumstances indicate the perpetrator did not intend discovery, actual discovery and prevention of damage will be of no help to the perpetrator. That is what I believe

the Court to have meant in *United States v. Stewart, supra,* when it stated that the accused would have acted in a more surreptitious manner had he intended to commit sabotage. Specifically, a surreptitious act could have significant consequences if not discovered. By affirming an attempted willful damage to military property in violation of Article 80, 10 U.S.C. § 880, the Court obviously did not make probable discovery an absolute defense.

fewer aircraft. The unavailability of those aircraft clearly impacted the national defense.

I do not view the absence of successful prosecutions under section 2155 as a significant factor. The first "successful applicant" must appear at some point in time.

Whatever the accused's emotional ·state, he deliberately and surreptitiously damaged the two aircraft knowing the result would be an inability to fly them. He was well aware of his unit's mission, and he knew what impact the unavailability of the aircraft would have on his unit. By intentionally damaging the aircraft the accused did, in fact, evidence the necessary intent, and I would hold him accountable for doing so.

I would affirm the verdict of the court below and the sentence as approved by the convening authority.

I concur with the resolution of the other assignments of error.