UNITED STATES, Appellant and
Cross-Appellee,

v.

John J. JOHNSON, Jr., Airman, U.S.
Air Force, Appellee and
Cross-Appellant.

No. 45,760.
ACM 23556.

U.S. Court of Military Appeals.

May 26, 1987.

For the United States: *Major Robert E. Ferencik, Jr.* (argued); *Colonel Kenneth R. Rengert* and *Major Michael J. Hoover* (on brief); *Colonel Joe R. Lamport* and *Lieutenant Colonel Robert E. Giovagnoni.*

For the Accused: *Major Conrad C. Baldwin, Jr.* (argued); *Colonel George R. Stevens* and *Major Richard A. Morgan* (on brief); *Colonel Leo L. Sergi.*

## Opinion of the Court

EVERETT, Chief Judge:

This case concerns the state of mind required for conviction of sabotage under 18 U.S.C. § 2155. It reaches us on certified questions from the Judge Advocate General of the Air Force. 15 M.J. 293 (C.M.A. 1983).

### I

A general court-martial with members tried Airman Johnson for sabotage of two RF-4 aircraft in violation of 18 U.S.C. § 2155, willful damage to military property of the United States—namely, the same two aircraft, and aggravated arson of a barracks, in violation of Articles 134, 108, and 126, Uniform Code of Military Justice, 10 U.S.C. §§ 934, 908, and 926, respectively.

Specification 1 of Charge I alleged:

In that AIRMAN JOHN J. JOHNSON, JUNIOR, United States Air Force, 363 Aircraft Generation Squadron, did, at Shaw Air Force Base, South Carolina, on or about 8 September 1981, with intent to injure, interfere with or obstruct the national defense of the United States, willfully injure national defense utility, to wit: an RF-4 aircraft, tail number 66-397, by placing a bolt in an engine intake, in violation of 18 United States Code Section 2155.

Specification 2 of the Charge was identical except that it alleged tail number 67-457.

Specification 1 of Charge II alleged:

In that AIRMAN JOHN J. JOHNSON, JUNIOR, United States Air Force, 363 Aircraft Generation Squadron, did, at Shaw Air Force Base, South Carolina, on or about 8 September 1981, without proper authority, willfully damage, by placing a bolt in the engine intake, an RF-4, tail number 66-397, military property of the United States, the amount of said damage being in a sum greater than $100.00.

A companion specification was identical except for the tail number.[1]

The Government offered the accused's confession and other evidence that on September 8, 1981, Johnson had "deliberately placed a bolt in the air intake of ... aircraft 66-397 just" before "engine start." On that same day, he also had put another "bolt in ... the forward engine bay or the variramp of aircraft 66-457." 15 M.J. 676, 677. Substantial damage was done to each aircraft.

Colonel Warren Sams, Deputy Commander for Maintenance, testified that the 363d Tactical Fighter Wing—to which Johnson's squadron belonged—had "an operational mission" in connection with the North Atlantic Treaty Organization "and other contingencies that might arise" and a "training mission" to "train both pilots and weapon system operators in the RF-4 for various units that they may be assigned to." Asked how each "mission fits into the overall scheme of the defense of our country," he replied:

Well, both the operations and training fit into that scheme. The operations fit into it in that in reconnaissance you are the eyes for the battlefield commander; you've got to go out and get real time reconnaissance for him as rapidly as possible and bring it back so he can make decisions about what to do when employing his forces in the field, and also to find targets that your aircraft can go out and strike. The training squadrons also have a mission in the fact that, if we were in a wartime operation, they would be providing replacement crews for crews that we lost in battle.

Also, Colonel Sams explained that only 21 RF-4 aircraft were available at Shaw Air Force Base; that each aircraft was "a very limited resource"; and that the foreign-object damage (FOD) to the engines had caused loss of "a very valuable resource for an extended period of time" and had affected the "mission capable rates" of the Wing.

In addition, trial counsel presented evidence that, less than 2 weeks before the two aircraft were damaged, Johnson had

1. The arson charge concerned misconduct several months later.

been present for slide briefings about the hazard of foreign-object damage to aircraft and about the threat of sabotage directed at various Air Force weapon systems, including the RF–4. This briefing had included the warning that

> [s]abotage is another continuous threat to the Air Force, but it is not always used only by enemies of the United States.
>
> *Angry or bored airmen also contribute to the problem,* so stay alert to things that don't belong on the aircraft, or switches that are out of position.

(Emphasis added.)

Johnson testified in his own behalf that on September 8, he had received a letter of reprimand upon first arriving at work. Subsequently, he helped prepare aircraft 66–397 "for launch, and ... was standing fireguard waiting for the crew to show up." After buckling "them into the cockpit," he had been "waiting for engines to crank up and approximately about a minute before we were about ready to start, I picked up a screw and I threw it at the aircraft and it went into the intake of the engine."

According to the accused, at that time "I was angry; I was upset. I was thinking about all of my problems that I had just been through and going through at the time." He had not stopped "the launch" of the aircraft when he "heard the screw hit the intake" because "I was scared. I knew it went into the engine. I knew what damage it could cause but I didn't know what to do, and the engines started immediately after I did it." Johnson insisted, however, that, although he was "angry" and "upset," he "had no intentions whatsoever to interfere with or destruct the national defense—no intentions whatsoever." He did not admit having any connection with the damage to the second aircraft.

The accused was found guilty on all charges and sentenced by the court-martial members to a dishonorable discharge, confinement for 30 years, total forfeitures, and reduction to airman basic. The convening authority approved these results,

except for reducing the confinement to 20 years. The Court of Military Review, by divided vote, "disapprove[d] the convictions for sabotage, approve[d] the remaining findings, and," upon reassessment of the sentence, reduced the confinement to 12 years. *United States v. Johnson,* 15 M.J. 676, 677, 680 (A.F.C.M.R.1983). The majority's rationale for disapproving the sabotage findings was that the Government's evidence was insufficient to satisfy the intent requirements of 18 U.S.C. § 2155. In dissent, Judge Snyder concluded that the evidence was sufficient.

The Judge Advocate General of the Air Force then certified these two issues to this Court:

> DID THE AIR FORCE COURT OF MILITARY REVIEW EMPLOY AN IMPROPER LEGAL STANDARD IN REACHING ITS FINDING THAT THERE WAS INSUFFICIENT PROOF OF INTENT TO COMMIT SABOTAGE AS THAT INTENT IS DEFINED IN 18 U.S.C. § 2155?
>
> IF THE ANSWER TO THE FOREGOING IS IN THE AFFIRMATIVE, SHOULD THE CASE BE REMANDED TO THE COURT OF REVIEW FOR RECONSIDERATION OF THE ADEQUACY OF PROOF OF INTENT, BASED UPON PROPER CRITERIA?

The accused cross-petitioned for review; and we granted that petition with respect to an issue concerning the multiplicity of the sabotage specifications and the corresponding specifications of willful damage to military property. 16 M.J. 448. Upon our initial consideration of the case, we were in doubt whether the majority of the Court of Military of Review had concluded the Government's evidence was legally insufficient to establish the intent requisite for conviction under 18 U.S.C. § 2155 or whether, instead, they had been exercising their factfinding powers. Accordingly, we remanded the case to that court for clarification. 16 M.J. 150. Upon remand, the Court of Military Review responded that both the majority opinion and the dissent were dealing only with the issue of legal

sufficiency of the Government's evidence. We now also address that issue.[2]

## II

Chapter 105 of Title 18, United States Code, is entitled "Sabotage" and contains section 2155, which provides:

(a) Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any national-defense material, national-defense premises, or national-defense utilities, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

A counterpart provision, 18 U.S.C. § 2153, applies in time of war or national emergency and contains this language:

(a) Whoever, when the United States is at war, or in times of national emergency as declared by the President or by the Congress, with intent to injure, interfere with, or obstruct the United States or any associate nation in preparing for or carrying on the war or defense activities, or, *with reason to believe that his act may injure, interfere with, or obstruct the United States or any associate nation in preparing for or carrying on the war or defense activities,* willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any war material, war premises, or war utilities, shall be fined not more than $10,000 or imprisoned not more than thirty years, or both.

(Emphasis added).

Definitions of "war material," "war premises," "war utilities," "associate nation," "national-defense materials," "national-defense premises," and "national-defense utilities" are contained in 18 U.S.C. § 2151. According to these definitions:

The words "national-defense material" include arms, armament, ammunition, livestock, forage, forest products and standing timber, stores of clothing, air, water, food, foodstuffs, fuel, supplies, munitions, and all other articles of whatever description and any part or ingredient thereof, intended for, adapted to, or suitable for the use of the United States in connection with the national defense or for use in or in connection with the producing, manufacturing, repairing, storing, mining, extracting, distributing, loading, unloading, or transporting of any of the materials or other articles hereinbefore mentioned or any part or ingredient thereof.

\* \* \* \* \* \*

The words "national-defense utilities" include all railroads, railways, electric lines, roads of whatever description, railroad or railway fixture, canal, lock, dam, wharf, pier, dock, bridge, building, structure, engine, machine, mechanical contrivance, car, vehicle, boat, aircraft, airfields, air lanes, and fixtures or appurtenances thereof, or any other means of transportation whatsoever, whereon or whereby such national-defense material, or any troops of the United States, are being or may be transported either within the limits of the United States or upon the high seas or elsewhere; and all air-conditioning systems, dams, reservoirs, aqueducts, water and gas mains and pipes, structures, and buildings, whereby or in connection with which air, water, or gas may be furnished to any national-defense premises or to the Armed Forces of the United States, and all electric light and power, steam or pneumatic power, telephone and telegraph plants, poles, wires, and fixtures and wireless stations, and the buildings connected with the maintenance and operation thereof used to supply air, water, light, heat, power, or facilities of communication to any national-defense premises or to the Armed Forces of the United States.

---

**2.** Appellate defense counsel had moved to dismiss the certificate of review on the ground that the Court of Military Review had exercised its factfinding authority, as to which we have no power to review. In light of the action of the court below upon our remand, the motion to dismiss was denied. 16 M.J. 410.

The accused relies heavily on the difference in language between §§ 2155(a) and 2153(a) in arguing that the Government's evidence did not meet the intent requirements for peacetime sabotage. He claims that the words "with reason to believe" in § 2153(a) were designed to allow conviction in time of war or national emergency if injury to "war or defense activities" was a foreseeable consequence of the willful injury to war material, war premises, or war utilities. On the other hand, § 2155(a), applicable also in peacetime, requires a purpose "to injure, interfere with, or obstruct the national defense."

We agree with the accused that Congress intended for some difference in application to accompany the difference in language in these two sections. This conclusion is all the more obvious because, as originally proposed, § 2155(a) contained "reason to believe" language derived from § 2153(a); but those words were deleted as a result of floor debate.[3]

However, to accept the premise that §§ 2153 and 2155 require different states of mind does not inevitably lead to the conclusion desired by the accused. In determining the meaning of "intent" as used in § 2155(a), we find helpful these comments by Chief Justice Burger, writing for the Court in *United States v. United States Gypsum Co.*, 438 U.S. 422, 445, 98 S.Ct. 2864, 2877, 57 L.Ed.2d 854 (1978):

> The element of intent in the criminal law has traditionally been viewed as a bifurcated concept embracing either the specific requirement of purpose or the more general one of knowledge or awareness.
>
> "[I]t is now generally accepted that a person who acts (or omits to act) intends a result of his act (or omission) under two quite different circumstances: (1) when he consciously desires that result, whatever the likelihood of that result happening from his conduct; and (2) when he knows that the result is practically certain to follow

from his conduct, whatever his desire may be as to that result." W. LaFave & A. Scott, Criminal Law 196 (1972). See also G. Williams, Criminal Law: The General Part §§ 16, 18 (2d ed 1961); Cook, Act, Intention, and Motive in the Criminal Law, 26 Yale L.J. 645, 653–658 (1917); Perkins, A Rationale of *Mens Rea*, 52 Harv.L.Rev. 905, 910–911 (1939).
> Generally this limited distinction between knowledge and purpose has not been considered important since "there is good reason for imposing liability whether the defendant desired or merely knew of the practical certainty of the results." LaFave & Scott, *supra*, at 197. See also ALI, Model Penal Code, Comment on § 2.02, p. 125 (Tent. Draft No. 4, 1955). In either circumstance, the defendants are consciously behaving in a way the law prohibits, and such conduct is a fitting object of criminal punishment. See Working Papers of the National Commission on Reform of Federal Criminal Laws 124 (1970).

In view of the seriousness of the harm involved, we believe Congress used the term "intent" in § 2155(a) to mean knowing "that the result is practically certain to follow," regardless of any desire, purpose, or motive to achieve the result. Thus, § 2155(a) would be satisfied if someone acted when he knew that injury to the national defense would be the almost inevitable result, even though the reason for his action had nothing to do with national defense.

Usually the intent to cause certain results is established by evidence that those results followed naturally and probably from the action that was taken. The permissible inference, as to which a military judge often has occasion to instruct court-martial members, is that the accused decided to act despite the likely consequences of doing so. However, only an *inference* is involved; and the necessary intent is lacking unless the factfinder determines not

---

**3.** Judge Snyder's dissent in the Court of Military Review discusses the legislative history of 18 U.S.C. § 2155. 15 M.J. 676, 681–83. The history of § 2153 is traced in *United States v. Achtenberg*, 459 F.2d 91, 94 (8th Cir.), *cert. denied*, 409 U.S. 932, 93 S.Ct. 229, 34 L.Ed.2d 187 (1972).

only that the prohibited results were highly foreseeable, but also that the accused, in fact, knew they were almost certain and nonetheless went ahead.

On the other hand, the language of § 2153(a)—which uses the phrase "reason to believe"—eliminates the need for the factfinder to take this final step. All it demands is that the prosecution demonstrate that a reasonable man would have believed that the act taken would interfere with national defense. This standard is solely objective; and the failure of an accused to recognize the inevitability of the proscribed consequences is immaterial. Thus, unlike a trial under § 2155(a), there would be no occasion to instruct the court-martial members about the permissible inference that the accused intended the natural and probable consequences of his action. Instead, the instruction would focus on the results a reasonable man would have anticipated.

Recently, the Court of Appeals for the Eighth Circuit, by divided vote, upheld the conviction under 18 U.S.C. § 2155 of nuclear protesters who had intentionally damaged missile sites. *See United States v. Kabat,* 797 F.2d 580 (8th Cir.1986). The defendants had claimed that their activities were undertaken from religious motives and from a desire to avoid the world destruction threatened by nuclear arms. The majority concluded that § 2155(a) did not require "the intent to act to what one subjectively believes to be the detriment of the United States." *Id.* at 587. Without endorsing the conclusion reached in the case at bar by the Air Force Court of Military Review, the majority in Kabat observed that its position was consistent therewith. *Id.* at 584–85. It noted that *"Johnson,* however, does not hold that intent to injure the national defense may *never* be inferred from the intentional commission of the act itself, only that such an inference could not be drawn on the given facts." *Id.* at 585. We perceive that nothing in *Kabat* is inconsistent with the position to which we now subscribe. Indeed, the holding there that the purpose of the defendants was irrelevant conforms to our view that in the present case the accused's purpose and motive—anger, resentment, or whatever—are immaterial.

We have considered other cases cited by the accused. *See, e.g., United States v. Stewart,* 19 U.S.C.M.A. 417, 42 C.M.R. 19 (1970); *United States v. Banks,* 7 M.J. 501 (A.F.C.M.R.1979). We conclude, however, that they do not espouse unequivocally the accused's view that one cannot be convicted under § 2155(a) even though the Government proves that, regardless of his purpose or motive, he acted in a way that he was almost certain would injure or obstruct national defense.

The term "national defense" is not defined in 18 U.S.C. § 2151 or 2155, or elsewhere in Chapter 105. Certainly, this term can be used very broadly. Senator Cummins made that point during Senate debates on the Espionage Act of 1917 when he asked:

Is it ["national defense"] confined to the Army and the Navy? Evidently not, for it is universally agreed that it extends to all manufactories engaged in producing arms and munitions of war. But is it confined to manufactories engaged in producing the things that are directly used in war, or is it to be extended to every national energy which makes up an adequate and effective national defense?

I have heard it applied, and so have you, to agriculture. It is said that it is necessary to make stable, permanent, and general the development of our fields in order that in time of war our armies may be successfully sustained, or our citizens adequately fed. I have heard it applied to schools, because it is alleged that we can not create an adequate national defense unless we have cultivated the heart and the mind. I do not believe it will be asserted here that the words "national defense" do extend to these things, but no one can tell to what they extend. They may mean, I suppose, anything that is necessary in order successfully to defend ourselves against an enemy or successfully to at-

tack an enemy, if attack is the approved method of defense at any given time. I should think that it would include everything from the mines and the forests which ultimately passes into the structures or the arms that are used in war, no matter whether they are used immediately in battle, or whether they are used in general connection with the Army or the Navy.

54 Cong.Rec. 3485 (1917).

We do not know how expansive a meaning Congress intended for "national defense" to have in § 2155(a). However, we note that in at least one trial under this section, these words have been equated to "a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." *United States v. Kabat, supra* at 586, *quoting Gorin v. United States,* 312 U.S. 19, 28, 61 S.Ct. 429, 434, 85 L.Ed. 488 (1941); *see also United States v. Melville,* 309 F.Supp. 774, 780 (S.D.N.Y.1970).

■ In any event, we conclude that the term "national defense" includes injury to a combat aircraft, which, according to the testimony of Colonel Sams, was "a very valuable resource" and "a very limited resource." Certainly, the experienced officers who sat on the general court-martial that tried Johnson could reasonably have decided that the injury which he inflicted on the two aircraft was an injury to the "national defense."

■ The Government established that less than 2 weeks before, Johnson had received briefings about sabotage of aircraft, such as the RF–4. In light of those briefings and his flight-line experience with this aircraft, the factfinders could have reasonably inferred that he anticipated that a bolt thrown in an engine intake would damage the aircraft and also that he would have recognized that such damage would constitute injury to the "national defense." If, in fact, he did know that it was practically certain that damage to the aircraft would occur because of his acts and that, in turn, this would injure national defense, he had

the state of mind requisite for conviction under § 2155(a)—even though he may not have desired or wished to injure national defense.

Even though the evidence was legally sufficient for the factfinders to determine that the accused intended to injure national defense, the Court of Military Review still had the responsibility in the exercise of its own factfinding powers to decide whether, in fact, Johnson was practically certain what the results of his acts would be. Unless the court below was satisfied, from its own evaluation of the evidence, that Johnson had this state of mind—this practical certainty as to the result—it could not uphold the sabotage convictions.

### III

■ While we hold that the majority of the Court of Military Review apparently used too strict a standard in determining legal sufficiency of the evidence, we conclude that it is unnecessary to remand the case to them for determination of the factual sufficiency of the evidence. In our examination of the record, we have discovered fatal instructional deficiencies which constitute plain error and in any event preclude affirmance of the sabotage convictions.

At the outset of the trial, the military judge took judicial notice of 18 U.S.C. § 2155 and the definition of "national defense utilities" in 18 U.S.C. § 2151. Then he read these statutory provisions to the court members. Later in the trial, when instructing the members on findings, he described the elements of each alleged sabotage offense in these terms:

The first element is: That at Shaw Air Force Base, South Carolina, on or about 8 September 1981, the accused placed a bolt in an engine intake of an RF–4 aircraft, tail number 66–397 [in specification 1 and 67–457 in specification 2].

The second element is: That he did so with intent to injure, interfere with or

obstruct the national defense of the United States.

The third element is: That by such conduct, the accused *willfully injured national defense utility, to wit: that same RF–4 aircraft.*

The fourth element is: That by doing so, the accused violated 18 United States Code Section 2155.

(Emphasis added.)

The judge gave no instruction as to the meaning of "national defense," and he did not reiterate the definition of "national-defense utilities" contained in 18 U.S.C. § 2151. That definition contains the word "aircraft"; but it is limited in scope by the phrase "or any other means of transportation whatsoever, whereon or whereby such national-defense material, or any troops of the United States, are being or may be transported." At no point in the trial did the judge give any definition of the terms "national defense material" or "troops" [4] as used in § 2155(a).

Furthermore, the language with which the judge described the "third element" is confusing. It is subject to the construction that, as a matter of law, each RF–4 aircraft was a "national defense utility." Under that interpretation the judge had taken from the court members and treated as a matter of law the question whether each aircraft was a "national-defense utility." Since any such determination would rest on the testimony of Colonel Sams and other witnesses, it could not properly be withdrawn from the court members.

In sum, the court members were left to grope without adequate instructional guidance from the military judge. Because this guidance was lacking as to each specification alleging sabotage, the findings of guilty on those specifications must be set aside.

### IV

■ Appellant claims that, as drafted, each willful-damage specification was multiplicious with the corresponding sabotage specification. Appellate government counsel reply that "national-defense utilities" are not necessarily "military property" and "military property" is not always a "national-defense utilit[y]."

Of course, the allegation in each sabotage specification that the damage was to an RF–4 aircraft at Shaw Air Force Base strongly tends to suggest that these willfully injured aircraft were military property of the United States within the meaning of Article 108 of the Uniform Code. Under such circumstances, willful damage to military property has been held to be a lesser-included offense of sabotage. *United States v. Banks, supra; United States v. Reyes,* 30 C.M.R. 776 (A.F.B.R.), *pet. denied,* 12 U.S.C.M.A. 731, 30 C.M.R. 417 (1960). In view of the allegations in the sabotage specifications, we conclude that findings of guilty on Charge I and Charge II could not coexist. .

### V

The first certified question is answered in the affirmative. However, the second is answered in the negative because, in light of the instructional errors, there is no necessity for the Court of Military Review to determine the factual sufficiency of the evidence of sabotage.

If the Government so elects, a rehearing may be ordered with respect to Charge I and its two specifications. However, in that event appropriate action shall be taken with respect to Charge II and its two specifications. If the Government does not conduct a rehearing, then the case may be disposed of by affirmance of the findings of guilty that were affirmed by the Court

---

4. Actually, the term "national defense utilities" seems intended chiefly to deal with transportation, power, and communications facilities— *rather than a weapon system like an RF–4.* Perhaps this aircraft fits better into the category of "national-defense material," as defined by 18 U.S.C. § 2151. However, we believe the definition of "national-defense utilities" is broad enough so that it could include an RF–4 aircraft.

of Military Review and the sentence, as reassessed by that Court.

If, within 30 days of the date of this opinion, counsel for the Government advises the Clerk of this Court in writing that a rehearing will not be conducted, we shall issue a mandate affirming the decision of the court below in its entirety. Otherwise, an order will issue setting aside the decision of the Court of Military Review and remanding for further proceedings.

Judge COX concurs.

Judge SULLIVAN did not participate.