797 F.2d 580
 UNITED STATES of America, Appellee,
v.
Carl KABAT, Appellant.
UNITED STATES of America, Appellee,
v.
Paul KABAT, Appellant.
UNITED STATES of America, Appellee,
v.
Lawrence Jacob CLOUD-MORGAN, Appellant.
UNITED STATES of America, Appellee,
v.
Martin John HOLLADAY, Appellant.
 Nos. 85-1416 to 85-1418 and 85-1659.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 16, 1985.
Decided July 22, 1986.
Opinion on Denieal of Rehearing and Rehearing En Banc Oct. 24, 1986.
 
 Prof. Norman A. Townsend, Atlanta, Ga., and Henry M. Stoever, Kansas City, Mo., for appellant.
 Robert G. Ulrich, U.S. Atty., Kansas City, Mo., for appellee.
 Before BOWMAN, Circuit Judge, BRIGHT, Senior Circuit Judge, and WOLLMAN, Circuit Judge.
 WOLLMAN, Circuit Judge.
 
 
 1
 The issue in this case is whether a federal prohibition against sabotage, 18 U.S.C. Sec. 2155 (1982), that requires that the accused have acted "with intent to injure, interfere with, or obstruct the national defense of the United States" can be applied against nuclear protestors who intentionally damage missile sites. Carl Kabat, Paul Kabat, Lawrence Jacob Cloud-Morgan, and Martin John Holladay were convicted by jury of sabotage and other crimes for their activities at two Minuteman II missile silos in Missouri, and on appeal they raise lack of intent as well as international law and necessity defenses. We affirm.
 
 
 2
 Carl and Paul Kabat, Lawrence Cloud-Morgan, and Helen Woodson on November 9, 1984, took a rented jackhammer and compressor plus other tools to "N5," a U.S. military installation in Missouri housing launch and support facilities for a Minuteman II intercontinental ballistic missile. After cutting the padlock on a perimeter fence, these defendants entered the missile site and used their tools to damage three radar devices, various electrical cables, two locks controlling access to the missile for maintenance, and the concrete launch lid over the missile. Repairs were later estimated at $29,073.60. The defendants while at the site also hung signs bearing messages such as "Violence Ends Where Love Begins," and they left a note explaining that their "intent" had been to save children and the world and to prevent "mass murder" since their Christian faith required them to "accept personal responsibility for ending th[e] cycle of violence that threatens us all." When military security personnel arrived at N5, these defendants were sitting in a semicircle holding hands and singing or chanting. In addition to their tools, these defendants had brought to the site bread and wine, a book of prayers, several pictures of children, and a baby bottle filled with a substance that either was or was supposed to represent blood.
 
 
 3
 The N5 defendants were charged with conspiracy, 18 U.S.C. Sec. 371 (1982); willful destruction of government property, 18 U.S.C. Sec. 1361 (1982); sabotage; and entering property within the control of the United States for a purpose prohibited by law. 18 U.S.C. Sec. 1382 (1982). Though offered appointed counsel, they chose to represent themselves. The district court[1] allowed testimony on the destructive power of nuclear weapons, the "offensive" nature of the newer nuclear missiles, the alleged escalation of risks from the availability of nuclear weapons and the nuclear buildup, the role in history of civil disobedience, international law, and the defendants' beliefs that, based upon the statements of religious leaders, they were required by the higher law of God to prevent the crime against humanity and destruction of God's world represented by the nuclear threat. The court, however, instructed the jury that neither good motive alone nor moral, religious, or political belief was a defense to crime and that it would be a violation of their duty as jurors if they were to pass judgment on U.S. nuclear weapons policy. The N5 defendants were convicted on all counts.
 
 
 4
 At the sentencing the district court characterized the crimes committed by the N5 defendants as "serious." The N5 defendants' actions, the court suggested, constituted unilateral attempts to thwart the policies of elected decisionmakers, legitimatized violence to emphasize personal disagreement, and reflected arrogance in the defendants' certainty in the rightness and righteousness of their own views.[2] The court sentenced Woodson[3] and Carl Kabat each to nine years plus restitution on the sabotage count, nine years (to be served consecutively) and restitution on the destruction of property count, six months (to be served concurrently) on the trespassing count, and five years probation (to begin at the time of unconditional release from jail) on the conspiracy count. Paul Kabat was sentenced similarly but with the consecutive sentences at five years each, the concurrent sentence at five months and the probation at four years. For Cloud-Morgan the sentence terms were four years, four years, and four months respectively, with three years probation.
 
 
 5
 Meanwhile, on February 9, 1985, the first day of the Kabat-Cloud-Morgan-Woodson trial, Martin John Holladay in a show of support for the N5 defendants entered a second missile site, "N11," also in Missouri, and inflicted $1,089.74 in damage (mostly to electrical equipment). Holladay used spray paint to display messages such as "Disarm or Dig Graves," and a letter found on his person proclaimed that he had acted "in hope that we renounce military violence to embrace the loving nonviolence of the Gospels." The letter further declared that it was the law's duty to "uphold rather than hinder" acts of disarmament because nuclear weapons place millions of innocent lives in jeopardy and constitute "crimes against humanity and God." The tools Holladay carried onto the site were inscribed, for example, with Bible verses, and again a baby bottle filled with a substance that either was or was supposed to represent blood was found.
 
 
 6
 Holladay was charged with willful destruction of government property and sabotage, and he also elected to proceed pro se. The district court[4] refused to permit Holladay to argue or present evidence of international law; and while allowing much testimony on the effects of and need for nuclear weapons, the court instructed the jurors several times during the trial that they were not to consider the correctness of U.S. nuclear policy and that good motive was not a defense to crime. Holladay was convicted on both counts and was sentenced to eight years plus restitution and a $1,000 fine on the destruction of property count to be followed upon unconditional release from prison with five years probation on the sabotage count. The court at the sentencing commented on Holladay's arrogance and willingness to set himself up as "judge and jury," above elected representatives and government specialists, on matters far beyond his comprehension.
 
 
 7
 All defendants on appeal argue that the evidence was insufficient to support the sabotage verdicts because the government failed to show they acted with intent to injure the national defense and that the district courts erred in refusing to permit them to rely on international law defenses. The N5 defendants further argue that the district court through its instructions improperly precluded the jury from considering certain evidence of intent and in effect directed a verdict on that issue,[5] while Holladay further argues that the district court erred in taking from the jury the defense of necessity.
 
 I.
 
 8
 The sabotage statute under which the defendants were charged provides that "[w]hoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys, * * * or attempts to so injure [or] destroy * * * any national-defense material [or] national-defense premises * * * shall be fined not more than $10,000 or imprisoned not more than ten years, or both." 18 U.S.C. Sec. 2155(a) (emphasis added). The defendants argue that conviction thus requires proof of "specific intent" and that specific intent cannot be inferred merely from the intentional doing of an act but necessitates evidence of subjective state of mind. The government had to--yet failed to--prove, the defendants contend, something beyond the fact that they admittedly intentionally damaged the respective missiles with knowledge of the perceived roles of the missiles in the national defense.
 
 
 9
 In the context of this same statute, for example, a military court held an airman not guilty of sabotage when he deliberately placed bolts in airplane engines, causing damage in excess of $26,000 to each of two aircraft, because he was angry and upset after receiving a letter of reprimand. United States v. Johnson, 15 M.J. 676 (A.F.C.M.R.1983). The court quoted the airman as having testified, "I was thinking about all of my problems that I had. But I had no intentions whatsoever to interfere with or destruct the national defense--no intentions whatsoever," and concluded that it was not persuaded that the accused intended sabotage. Id. at 678. The court quoted language from United States v. Stewart, 42 C.M.R. 19 (C.M.A.1970), in which it was held that the necessary intent to commit sabotage could not be inferred where the defendant's act had been to deliberately in plain sight of a sailor and an officer throw a pipe and chain into an airplane air intake in hopes of avoiding another cruise assignment. Johnson, 15 M.J. at 678; see id. at 681 (Snyder, J., concurring in part and dissenting in part); see also United States v. Banks, 7 M.J. 501 (A.F.C.M.R.1979) (though finding it unnecessary to reach the issue, the court suggested there was a significant question whether the defendant intended to damage the national defense when he assisted in gluing together a drag parachute in a desire to cause a work stoppage as an act of revenge against the Air Force).
 
 
 10
 Johnson, however, does not hold that intent to injure the national defense may never be inferred from the intentional commission of the act itself, only that such an inference could not be drawn on the given facts. See 15 M.J. at 678. The N5 defendants' acts are of an entirely different nature. This is not a case where an employee turned destructive against his employer's property out of frustration with or malice toward that employer and the employer just happened to be the military; the defendants here were outsiders who intentionally sought out military property, traveling to Missouri from Minnesota, Wisconsin, and even Vermont to do violence to nuclear missiles. They acted not despite the military implications of the property they damaged but expressly because of such military implications.
 
 
 11
 Furthermore, the government's case does not rest solely on inferences from the acts committed. The defendants, through their opening and closing statements and testimony, their comments at the time of arrest, and the messages they left at the missile sites, have continuously declared that their intent was to "disarm" the missiles. N5 transcript at 101, 172-74, 224, 263, 268, 434, 451-52, 455-56, 482, 485, 490, 505, 606, 620; Holladay transcript, Vol. I at 110, 127; Vol. II. at 88-91, 119. Paul Kabat testified that although his group did not know how much damage it would be able to do and would have been satisfied with symbolic disarmament, "If there was real disarmament took place[,] from my point of view, it would have been better. That's what I tried to do." N5 transcript at 434. Carl Kabat testified that the N5 defendants "attempted to actually disarm in every way possible, everything that we could do that would render this weapon unusable was done to the best of our humble and whatever ability." Id. at 486. He also testified that while taking Woodson's household hammer to the missile site had been symbolic, he and the other N5 defendants had purchased other tools of types they guessed might be useful for disarmament and that if they had had a month working day and night, he felt they could have reached the missile with the jackhammer. Id. at 485, 506.
 
 
 12
 These attempts by the defendants to render the missiles useless were admittedly undertaken to interfere with or thwart current U.S. defense policies. For example, the N5 defendants in the letter they left at that missile site spoke of the "murderous intent" of "our government's war policies" and stated that they intended to place their trust in the "Lord of Life" rather than in missiles. Id. at 451-52. Carl Kabat in his closing argument protested, "We are required to trust in the security of these weapons * * * and not to trust in God as the Bible requires." Id. at 615. Similarly, Holladay testified that his intent in seeking to disarm the missile was influenced by a pastoral letter which instructed, "We must find means of defending peoples that do not depend upon threat of annihilation." Holladay transcript, Vol. II at 104.
 
 
 13
 Defendants argue, however, that they did not thus intend to "injure, interfere with, or obstruct the national defense" because they thought disruption of current U.S. policies would actually increase the national security. The N5 defendants presented a witness who stated that, by disarming, "We don't destroy the defense. We don't destroy the national security. If anything, what we do is say that our security must be rooted on firmer grounds." N5 transcript at 416. Holladay also presented a witness who testified that the current nuclear buildup was "destabilizing" and was pushing the United States closer to war, Holladay transcript, Vol. I at 245-52, while Holladay himself testified that he did not intend to injure "national security" because "true security * * * doesn't come from nuclear weapons." Id. Vol. II at 116.
 
 
 14
 This argument basically is one of statutory interpretation. The district court at Holladay's trial defined "national defense" as "a generic concept of broad connotations referring to the military and naval establishments and the related activities of national preparedness." Id. Vol. II at 212.[6] The term "national defense" thus would refer to a tangible set of functions and policies which would remain constant as to all actors, and the government would only have to prove a subjective intent to interfere with what objectively would be known to be the nation's capacity to wage war and defend attacks.[7] The defendants to the contrary would make "national defense" synonymous with "national well-being" or "the country's best interests," all as determined in light of the international and military philosophies, politics, and convictions that subjectively existed in the mind of whichever particular citizen chose to act. In essence, the defendants would construe the phrase "intent to injure, interfere with, or obstruct the national defense" as a whole and would take it as a requirement of anti-U.S. animus.
 
 
 15
 What little precedent exists supports the position of the district court. The instruction the court gave adopted the definition of "national defense" approved by the Supreme Court in Gorin v. United States, 312 U.S. 19, 28, 61 S.Ct. 429, 434, 85 L.Ed. 488 (1941), in discussing the Espionage Act of June 15, 1917. See 18 U.S.C. Sec. 793 (1982). This definition similarly was adopted for the sabotage statute by the district court in United States v. Melville, 309 F.Supp. 774, 780 (S.D.N.Y.1970). Legislative history shows that a related sabotage provision, 18 U.S.C. Sec. 2153 (1982), was aimed not merely--or even mostly--at foreign agents but rather was prompted by a congressional concern with the impact on the war effort of strike-related violence. 56 Cong.Rec. 3111-20 (1918). Section 2155 was later added to make the prohibitions of section 2153 applicable also in peacetime. United States v. Bishop, 555 F.2d 771, 773 (10th Cir.1977). Thus, although section 2153 speaks of an intent to interfere with the United States "in preparing for or carrying on the war or defense activities" while section 2155 speaks of an intent to interfere with the "national defense," the change in language seemingly merely reflects the changed context rather than a legislative determination that violation of section 2155 should require a subjective malice toward the United States' best interests instead of merely toward its chosen course of defense activity.[8]
 
 
 16
 When the need is to protect the functioning of established military systems, it makes sense to attach the label and penalty of "sabotage" to the conduct of any person who consciously interferes therewith, whatever their degree of "patriotism." The scienter requirement of section 2155 protects those who do not recognize the military uses of property against which they do violence. See Melville, 309 F.Supp. at 780 (offering example). Such unknowing military interference will not be deterred by the imposition of penalties beyond those for destruction of property; additional protection, however, might be achieved equally from persons who take it upon themselves to correct national defense policies as from persons who act from anti-U.S. animus.[9] To allow all citizens who thought they could further U.S. security to act on their theories at will could make it impossible for this country to maintain a coherent defense system. As Judge (now Justice) Stevens wrote in a case involving burning of draft records:
 
 
 17
 One who elects to serve mankind by taking the law into his own hands thereby demonstrates his conviction that his own ability to determine policy is superior to democratic decision making. Appellant's professed unselfish motivation, rather than a justification, actually identifies a form of arrogance which organized society cannot tolerate.
 
 
 18
 United States v. Cullen, 454 F.2d 386, 392 (7th Cir.1971) (footnote omitted). We conclude that the "specific intent" required by section 2155 is only the intent to interfere with what may commonly be taken as the country's activities of national preparedness and not the intent to act to what one subjectively believes to be the detriment of the United States.
 
 
 19
 This conclusion also disposes of the defendants' arguments that they lacked "criminal intent" in that they were variously saving the world and its inhabitants from death and indiscriminate homicide, N5 transcript at 101, 434, 451; Holladay transcript, Vol. I at 23, 108; acting as required by their faith and the Bible by serving as "peacemakers" and taking personal responsibility for ending the "cycle of violence," N5 transcript at 451; Holladay transcript, Vol. II at 88; reversing a nuclear "insanity" that somehow developed contrary to the will of the American people, Holladay transcript, Vol. II at 97; preventing the immoral destruction of God's earth, N5 transcript at 490; and replacing the "worship" of missiles with trust in God. Id. at 615.
 
 
 20
 "Criminal intent" properly used refers to the mental state required by the particular statute which makes the act a crime. See W. LaFave & A. Scott, Handbook on Criminal Law Sec. 28, at 201 (1972). Once that intent has been proven, it is immaterial that a defendant may also have had some secondary, or even overriding, intent. Id. at 200. If the intent is overriding--that is, it reflects the ultimate end sought which compelled the defendant to act--it is more properly labeled a "motive." See Cullen, 454 F.2d at 391. This is true even with respect to a "specific intent" statute where the intent itself is stated in terms of an "end," for example, breaking and entering with intent to commit theft. The "end" of stealing money still could be just a means to another more valued consequence, such as giving to the poor; that ultimate goal, however, would not replace or negate the intent of stealing and would still be a "motive," while the intent to steal would still provide the "specific intent" required by the statute. See W. LaFave & A. Scott, supra, at 204-05.
 
 
 21
 This is precisely the situation with nuclear protestors. Though the defendants here intended disarmament only as a means and not as an end, their ultimate desire of saving innocent lives does not replace or negate the intent which the statute requires--that of interfering with U.S. defense functions, facilities, and policies. The defendants through their own words made clear that they saw such interference as necessary to their benevolent goals: when it is nuclear missiles, a part of the U.S. defense system, that are "illegal," "immoral," "criminal," and "murderous," one can hardly halt the inexorable slide toward killing and destruction without interfering with--and intending to interfere with--that established part of the U.S. defense system. Any argument to the contrary merely tries to read back into the statute a requirement of a subjective desire to interfere with the country's best interests, an interpretation that we have already rejected.
 
 
 22
 Viewing the evidence in the light most favorable to the government, see, e.g., United States v. Willis, 774 F.2d 258, 260 (8th Cir.1985); United States v. Martin, 772 F.2d 1442, 1445 (8th Cir.1985); United States v. Richmond, 700 F.2d 1183, 1189 (8th Cir.1983), we find there was sufficient evidence to support the jury verdicts of sabotage as to all defendants.
 
 II.
 
 23
 The N5 defendants argue that even if there was sufficient evidence of intent to sustain their convictions, the district court improperly foreclosed consideration of their opposing evidence on intent through its instructions to the jurors not to decide whether U.S. nuclear weapons policy was "morally proper, religiously sound, or politically wise" and not to consider "the purpose or motive of any defendant." This language in Instruction 29, the N5 defendants assert, in effect took away the presumption of innocence and further forced the jury to decide the issue of specific intent solely on the basis of the defendants' conduct despite the availability of direct evidence of the defendants' subjective states of mind.
 
 
 24
 When error is alleged in a portion of a jury charge, we review the challenged passage not in "artificial isolation" but in the context of the instructions as a whole. United States v. Udofot, 711 F.2d 831, 839 (8th Cir.), cert. denied, 464 U.S. 896, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983); e.g., United States v. Hutchings, 751 F.2d 230, 239 (8th Cir.1984), cert. denied, --- U.S. ----, 106 S.Ct. 92, 88 L.Ed.2d 75 (1985). It is not grounds for reversal that the charge might have been differently, or even better, worded; a district court has wide discretion on choice of language, and we will not find that discretion abused when the instructions as a whole accurately and adequately state the relevant law. Udofot, 711 F.2d at 839; United States v. Shigemura, 682 F.2d 699, 704, 705 (8th Cir.1982), cert. denied, 459 U.S. 1111, 103 S.Ct. 741, 74 L.Ed.2d 962 (1983).
 
 Instruction 29 in full read as follows:
 
 25
 I have permitted over the objection of the United States the presentation of a great deal of information. I did so in an effort to afford the defendants, who are laymen and a laywoman and not lawyers, every opportunity to present essentially all the information they wanted to. However, I am concerned that as a result of affording them this opportunity, and because of certain rulings I made, you may be confused about the job you are to perform. You have heard a good deal of philosophical, moral, religious and political comment about nuclear weapons. I fear that you may think that your job is to decide whether the United States' nuclear weapons policy is morally proper, religiously sound, or politically wise. Clearly and absolutely that is not your job. In fact, it would be a violation of your sworn duty for you to allow your consideration of this case to be influenced by your personal views on the moral, religious or political aspects of nuclear weapons policy.
 
 
 26
 Your job is to apply the law stated in these instructions to the facts as you find them from the evidence. You will not be asked to determine and you should not concern yourself with the purpose or motive of any defendant in doing any act that you find the defendant committed. Under these instructions, you should concern yourself only with determining whether the United States has established beyond a reasonable doubt the essential elements of each offense as to each defendant.
 
 
 27
 Instructions No. 12, 16, 17, 21, 22, and 25 set out the elements of the offenses charged. You will notice that in each of these instructions one essential element of each offense is some intent or mental state. In order to find a defendant guilty of any offense you must conclude that the mental state described has been proved by the United States beyond a reasonable doubt. However, you are not required by these instructions and you should not concern yourself about the motive, good or bad, or reason, laudable or not, initiating the doing of a particular act. (emphasis added)
 
 
 28
 The district court thus repeated that the government had the burden of proof beyond a reasonable doubt on each element of each offense (the phrase appears in virtually every instruction), reminded the jury that each offense included an intent requirement, and reemphasized specifically that the reasonable doubt standard applied to intent. The court further stated that it was the "motive * * * initiating the doing of a particular act" that the jury was to disregard. Read in context with earlier language in Instruction 9 associating motive with the desire or expectation that ultimate good would result from a criminal act,[10] this charge adequately distinguishes motive--the "why"--from the statutorily defined intent to engage in the proscribed act, albeit as a means to achieve that "why." The jury was left to make its own determination on the facts on intent and was in no way directed that intent existed or that there was any presumption that intent existed.
 
 
 29
 Furthermore, although some district courts have included in their instructions the clarification that evidence of good motive may give rise to an inference that the necessary intent did not exist, see, e.g., United States v. Richmond, 700 F.2d 1183, 1195 (8th Cir.1983), we find no error in the failure to include such language in this case. As discussed in Part I, supra, the N5 defendants' "good motives" are rooted in their premise that U.S. defense policies are a source of danger and evil, a premise that actually reinforces the existence of the required statutory intent of interference with the defense establishment. The N5 defendants cannot have been prejudiced by the district court's failure to point out to the jury a harmful inference. Instead, their argument basically is again that their "good motives" were the type or level of mental state addressed by section 2155. We reject this statutory interpretation here as we rejected it in the context of sufficiency of the evidence. The instructions foreclosed the jury only from considering under the label of "intent" subjective desires of the N5 defendants that were not "intents" within the contemplation of the relevant statute. We find no error in confining the jury to the law.III.
 
 
 30
 Holladay and the N5 defendants next challenge their convictions both for sabotage and on the other counts as violative of due process in that they were not allowed to assert in their defense a privilege to prevent alleged violations by the United States of international law. Such a privilege, they contend, was recognized by the international tribunal which presided over the trials of Nazi war criminals at Nuremberg after World War II. Certain of the Nuremberg defendants--for example, jurists who enforced laws making it illegal to interfere with Nazi policies of exterminating minority group members and dissidents, and industrialists who used slave labor in armament production--argued that they should not be prosecuted for their conduct because they had merely followed domestic law; the judgment, however, was that such individuals had had an obligation under international law to violate domestic provisions to prevent their country's continuing crimes against humanity. E.g., The Justice Case, reprinted in 3 Trials of War Criminals Before Nuremberg Military Tribunals Under Control Council Law No. 10 (1951). Thus, Holladay and the N5 defendants reason, they cannot be prosecuted pursuant to the various sections of the U.S. Code because they had a duty to violate domestic law to prevent the continuing international law violations allegedly represented by U.S. nuclear policy.
 
 
 31
 We find this argument to be unpersuasive. The parties found in the Nuremberg trials to have had a duty to violate domestic law had been required by such law to engage in acts that aided and furthered Nazi violations of international principles. The tribunal found that those persons had committed war crimes--crimes of commission, not crimes of omission--and any privilege to have violated domestic law would have followed from the need to avoid personal liability under international law. It would be a great extension of this argument to hold that persons who remained passive, neither aiding nor opposing their governments' international violations, were war criminals merely by virtue of their citizenship or residence in their given countries. And if failure to object does not make one complicit, persons such as the defendants here are in no danger of sanction under international law and can claim no privilege to violate domestic law to protect themselves. See United States v. Allen, 760 F.2d 447, 453 (2d Cir.1985); United States v. Montgomery, 772 F.2d 733, 737-38 (11th Cir.1985).[11] This conclusion of course makes it unnecessary for us to reach the defendants' arguments regarding the illegality of nuclear weapons.
 
 IV.
 
 32
 Finally, Holladay argues that on the evidence presented he was entitled to have the jury instructed on the theory that his criminal acts were justified by his reasonable belief that such conduct was necessary--and would be sufficient--to prevent a greater harm. A defendant upon timely request is entitled to an instruction if it contains a correct statement of the law and has support in the record. United States v. Marchant, 774 F.2d 888, 894 (8th Cir.1985); United States v. Manning, 618 F.2d 45, 47-48 (8th Cir.1980). It is sufficient that the defendant have shown an "underlying evidentiary foundation" as to each element of the defense, "regardless of how weak, inconsistent or dubious" the evidence on a given point may seem. United States v. Goss, 650 F.2d 1336, 1345 (5th Cir.1981) (cited with approval in United States v. Casperson, 773 F.2d 216, 223 n. 12 (8th Cir.1985)). We have never held, however, that a defense must be submitted to the jury even when "it cannot be said that a reasonable person 'might conclude' the evidence supports" the defendant's position. United States v. Creamer, 555 F.2d 612, 616 (7th Cir.) (cited in United States v. Prieskorn, 658 F.2d 631, 636 (8th Cir.1981)), cert. denied, 434 U.S. 833, 98 S.Ct. 118, 54 L.Ed.2d 93 (1977); e.g., United States v. Wells, 773 F.2d 230 (8th Cir.1985) (per curiam) (no error in failure to instruct the jury on the defense of coercion when insufficient evidence that the defendant lacked other alternatives to committing the crime.).
 
 
 33
 This latter situation is more nearly that which exists in necessity defense cases involving military protestors. A vital element of any necessity defense is the lack of a reasonable alternative to violating the law; that is, the harm to be avoided must be so imminent that, absent the defendant's criminal acts, the harm is certain to occur. United States v. Bailey, 444 U.S. 394, 410, 100 S.Ct. 624, 634, 62 L.Ed.2d 575 (1980). As the Tenth Circuit has emphasized,
 
 
 34
 The defense of necessity does not arise from a "choice" of several courses of action, it is instead based on a real emergency. It can be asserted only by a defendant who was confronted with such a crisis as a personal danger, a crisis which did not permit a selection from among several solutions, some of which did not involve criminal acts. It is obviously not a defense to charges arising from a typical protest.
 
 
 35
 United States v. Seward, 687 F.2d 1270, 1276 (10th Cir.1982), cert. denied, 459 U.S. 1147, 103 S.Ct. 789, 74 L.Ed.2d 995 (1983).
 
 
 36
 Consistent with this position, this court held in United States v. Kroncke, 459 F.2d 697 (8th Cir.1972), that the necessity defense was not available to persons who sought to argue that their attempts to destroy selective service records were the only means of ending the Vietnam War. We distinguished precedents relied on by Kroncke and his cohort as involving "direct and immediate peril" and added, "None of the cases even suggests that the defense of necessity would be permitted where the actor's purpose is to effect a change in governmental policies which, according to the actor, may in turn result in future savings of lives." Id. at 701.
 
 
 37
 Similarly, in a case decided less than a week before the start of Holladay's trial, the Ninth Circuit held that opportunities for speech and political participation made the necessity defense unavailable to a defendant who because of his concern about nuclear war had entered a missile assembly plant with the intention of damaging MX missiles and had used spray paint to write political slogans on the building. United States v. Dorrell, 758 F.2d 427 (9th Cir.1985); accord United States v. Quilty, 741 F.2d 1031 (7th Cir.1984) (per curiam); United States v. Cassidy, 616 F.2d 101 (4th Cir.1979) (per curiam). Protestors, the court reasoned, cannot create "necessity" through their own impatience with the "less visible and more time-consuming alternatives." Dorrell, 758 F.2d at 431. Nor was it relevant that the defendant, like Holladay, offered evidence that other protest activities and political efforts had been unavailing in halting the nuclear buildup; a lack of results might mean only that the will of the majority, legitimately expressed, had prevailed. Id. at 432. The necessity defense was never intended to excuse criminal activity by those who disagree with the decisions and policies of the lawmaking branches of government: in such cases the "greater harm" sought to be prevented would be the course of action chosen by elected representatives, and a court in allowing the defense would be making a negative political or policy judgment about that course of action. Judgments of that type, however, are not the province of judge (or jury) under the separation of powers established by our Constitution. Id.; United States v. May, 622 F.2d 1000, 1009-10 (9th Cir.), cert. denied, 449 U.S. 984, 101 S.Ct. 402, 66 L.Ed.2d 247 (1980).
 
 
 38
 Finally, in political protest cases a sufficient causal relationship between the act committed by the defendants and avoidance of the asserted "greater harm" inevitably will be lacking. For example, in Kroncke this court found the necessity defense inapplicable because the connection between destroying selective service records and ending the Vietnam War was too "tenuous and uncertain." 459 F.2d at 701. Similarly, the Ninth Circuit as an additional rationale in Dorrell held that the defendant had "failed as a matter of law to establish that his entry into [the air force base] and his spray-painting of government property could be reasonably anticipated to lead to the termination of the MX missile program and the aversion of nuclear war." 758 F.2d at 433; accord May, 622 F.2d at 1009; United States v. Cassidy, 616 F.2d 101, 102 (4th Cir.1979); United States v. Simpson, 460 F.2d 515, 518 (9th Cir.1972).
 
 
 39
 Both the Ninth and Tenth circuits have affirmed convictions of military protestors where the district court not merely refused to give an instruction on necessity but further excluded such evidence because it found from the offer of proof that not all elements of the defense could be shown. E.g., United States v. Cottier, 759 F.2d 760, 763 (9th Cir.1985); Dorrell, 758 F.2d at 433, 434; Seward, 687 F.2d at 1276; United States v. Lowe, 654 F.2d 562, 567 (9th Cir.1981). We can find no error here where the district court accepted such evidence before withholding from the jury a defense that was insufficient as a matter of law.
 
 
 40
 In conclusion, we observe that the first amendment is not implicated in this decision. The defendants raised no argument that the various criminal statutes as applied impermissibly infringed their opportunities to voice their opinions on significant public issues or penalized them for criticizing government acts. Instead, what the defendants sought to do, first physically and later through the courts, was to impose upon the U.S. legislative and executive branches the defendants' idea of "good government." The defendants would have lacked standing to bring a private suit challenging U.S. nuclear weapons policies, and they cannot by first committing crimes avoid the requirement that to invoke judicial authority they show an injury beyond that shared by all citizens. United States v. Allen, 760 F.2d 447, 453 (2d Cir.1985).
 
 
 41
 We find no error in the district courts' interpretations of and instructions on intent or in their rejections of the international law and necessity defenses. We affirm the convictions of all defendants on all counts.
 
 
 42
 BRIGHT, Senior Circuit Judge, dissenting.
 
 
 43
 I dissent.
 
 
 44
 I believe that the Government overreacted in charging Father Carl Kabat, Father Paul Kabat, Lawrence Jacob Cloud-Morgan, Helen Woodson[1] (the Kabat defendants), and Martin John Holladay with sabotage. Although these individuals engaged in unlawful conduct by damaging government property, their acts of civil disobedience did not amount to sabotage. The Kabat defendants and Holladay are peace activists seeking to end the threat of global annihilation brought on by a nuclear arms race which the two superpowers seem unable to control. For the reasons stated in this dissent, their sabotage convictions must be overturned.[2]I.
 
 
 45
 At the outset, I observe that the Kabat defendants and Holladay received very heavy prison sentences, far in excess of what I believe is justified under the circumstances. Those sentences are as follows:
 
 
 46
 1. Father Carl Kabat, age fifty-two, a Roman Catholic priest, from Madison, Wisconsin: Eighteen years imprisonment plus other penalties.
 
 
 47
 Father Carl Kabat is described in the record before us as an outspoken cleric who has devoted the past twelve years of his life to peace and justice issues.
 
 
 48
 2. Father Paul Kabat, age fifty-four, a brother of Carl Kabat and also a Roman Catholic priest, from St. Paul, Minnesota: Ten years imprisonment plus other penalties.
 
 
 49
 Father Paul Kabat is described in the record before us as a very committed, strong-willed person, who has demonstrated that he is willing to sacrifice his freedom for his beliefs.
 
 
 50
 3. Lawrence Jacob Cloud-Morgan, age forty-eight, a Native American and member of the Ojibway Tribe, from Minneapolis, Minnesota: Eight years imprisonment plus other penalties.
 
 
 51
 Cloud-Morgan is described in the record before us as a person who for the last several years has dedicated himself to a life of poverty, working in peace groups, shelters for the homeless and abused, the Catholic Church, and various Indian groups.
 
 
 52
 4. Helen D. Woodson, who acted with the Kabats and Cloud-Morgan: Eighteen years imprisonment plus other penalties.
 
 
 53
 Woodson has withdrawn her notice of appeal, so her case is not before us.[3]
 
 
 54
 5. Martin John Holladay, age thirty-one, from Wheelock, Vermont: Eight years imprisonment plus other penalties.
 
 
 55
 Holladay's conviction stemmed from his activities protesting the trial of the Kabats, Woodson, and Cloud-Morgan. Holladay is described in the record before us as a man of his word who has dedicated his life to Christian nonviolence.
 
 
 56
 All of these defendants have been incarcerated since the dates of their respective arrests--the Kabats, Cloud-Morgan and Woodson since November 12, 1984, and Holladay since February 19, 1985.
 
 
 57
 I take judicial notice of the great disparity between the sentences imposed on the Kabat defendants and Holladay and those imposed on other nuclear protestors who have committed similar acts.[4] Furthermore, I observe that the protest activities in this case injured no one and did not, and could not, damage the missile capability at the missile sites. The sentences are akin to penalties often imposed on violent criminals, such as robbers and rapists, or on those guilty of crimes considered heinous, such as drug dealers.
 
 
 58
 Sentencing statistics furnished by the Criminal Branch of the Administrative Office of the United States Courts highlight the disparate nature of the sentences imposed on the Kabat defendants and Holladay. Over the past four years, sixty-six defendants have been convicted and sentenced under 18 U.S.C. Sec. 1361 (1982) for willful destruction of government property. Of that total, forty persons received probation (61%), seventeen received imprisonment (26%), with an average sentence of thirty-six months, and nine others received split sentences (14%), that is, some limited prison time of six months or less and probation for the balance of the sentence. Over the same four year period, no one, other than the Kabat defendants and Holladay, has been convicted under 18 U.S.C. Sec. 2155 (1982) of sabotage. See Letter from the Criminal Branch of the Administrative Office of the United States Courts to Judge Bright (October 23, 1985) (discussing sentencing under 18 U.S.C. Secs. 1361, 2155 (1982)).
 
 
 59
 Thus, the only apparent reason for the extreme disparity between the sentences imposed on the Kabat defendants and Holladay and those imposed on other people who damage government property is that the Government additionally successfully prosecuted the Kabat defendants and Holladay for sabotage. Other similar cases of political protest against nuclear weapons and the government's military policy have been brought under section 1361 for willful destruction of government property, but not under the sabotage statute.
 
 
 60
 I do not here review the sentences imposed on the Kabat defendants and Holladay for excessiveness and gross abuse of discretion. See Woosley v. United States, 478 F.2d 139, 146-48 (8th Cir.1973) (en banc). That issue has not been raised.[5] I focus instead on the validity of the sabotage convictions. I believe, however, that if the sabotage convictions are flawed, the trial judges should modify and reduce the sentences on the related charges to sentences consistent with those imposed by other federal judges for similar crimes.
 
 II.
 
 61
 The Kabat defendants and Holladay were convicted of sabotage under 18 U.S.C. Sec. 2155(a) (1982). That statute reads as follows:
 
 
 62
 (a) Whoever, with intent to injure, interfere with, or obstruct the national defense of the United States, willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any national-defense material, national-defense premises, or national-defense utilities, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
 
 
 63
 The crucial aspect of the statute is the specific intent requirement contained in the phrase "with intent to injure, interfere with, or obstruct the national defense." I do not believe that case law or common sense justifies the majority's overexpansive reading of that phrase.
 
 
 64
 It seems to this writer that the phrase "intent to injure, interfere with, or obstruct the national defense" should be given a normal connotation--that which the defendant did or attempted to do must be shown to have intended harm to the national defense. The impregnability of the missile sites meant that the acts committed by the Kabat defendants and Holladay could in no way affect the capabilities of the two missiles in their respective missile silos. The missiles were fully operational both before and after the incursion onto the missile sites by the Kabat defendants and Holladay. The intent to disarm the missiles and thereby interfere with the national defense did not lie within the capabilities of the Kabat defendants and Holladay and they knew this. The most that they could do, and all they intended to do, was to commit a symbolic act against these weapons of destruction. The Kabat defendants and Holladay did what they intended to do--enter the missile sites, pound and chip away at the missile silo lids, pour "blood," hang banners, pray, and publicize the threat of nuclear war. Those acts did not, could not, and were not intended to damage the national defense in any way.
 
 
 65
 In United States v. Johnson, 15 M.J. 676 (A.F.C.M.R.1983), a decision by the United States Air Force Court of Military Review, the act of an airman who deliberately placed bolts in a military aircraft engine which caused the engine actual damage under circumstances where the airman was merely angry and upset was held not to be sabotage under section 2155. The court said "[u]nder the circumstances, we are not persuaded that the accused intended sabotage." Id. at 678. "[U]nless the necessary intent to commit sabotage can reasonably be inferred from the fact of the act itself, the accused's conviction must fall for lack of sufficient evidence." Id. (quoting United States v. Stewart, 19 U.S.C.M.A. 417, 42 C.M.R. 19, 21 (1972)).
 
 
 66
 The court then made these significant points:
 
 
 67
 First, authority is scant. No one has ever been successfully prosecuted under this precise statute. Neither civilian nor military case law in the 60-odd years since the statute was originally passed appears to support the dissenting position; thus, each of the military precedents must be laboriously distinguished. The legislative history is opaque and confusing, at best.
 
 
 68
 Second, convictions under similar statutes, such as 18 U.S.C. Sec. 2153(a), are inapposite. United States v. Achtenberg, 459 F.2d 91, 98 (8th Cir.1972). This is so because Section 2153(a) contains an additional clause for time of war/national emergency--absent in prosecutions such as the present one in peacetime--permitting a conviction upon a different and less strict basis. That clause provides:
 
 
 69
 (a) Whoever, when the United States is at war, or in times of national emergency as declared by the President or by the Congress, with intent to injure, interfere with, or obstruct the United States or any associate nation in preparing for or carrying on the war or defense activities, or with reason to believe that his act may injure, interfere with, or obstruct the United States or any associate nation in preparing for or carrying on the war or defense activities willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any war material, war premises, or war utilities, shall be fined not more than $10,000 or imprisoned not more than thirty years, or both (emphasis added).
 
 
 70
 See United States v. Bishop, 555 F.2d 771 (10th Cir.1977); United States v. Achtenberg, supra. See also Gorin v. United States, 111 F.2d 712 (9th Cir.1940); United States v. Melville, 309 F.Supp. 774, 780 (S.D.N.Y.1970). See generally Annot., 24 A.L.R. Fed. 906 (1975).
 
 
 71
 Although we find the accused not guilty of sabotage, we find that he clearly violated Article 108, U.C.M.J., willful damage to government property. This is a lesser included offense of sabotage. United States v. Reyes, [30 C.M.R. 776, 782-83 (A.F.B.R. 1960), pet. denied, 30 C.M.R. 417].
 
 
 72
 United States v. Johnson, supra, 15 M.J. at 678. Cf. United States v. Banks, 7 M.J. 501 (A.F.C.M.R.1979) (sabotage conviction against an airman who destroyed a drag parachute used in landing a military aircraft overturned due to military judge's error in instructions).
 
 
 73
 The majority discusses Johnson, but refuses to apply its holding to this case. Majority opinion at 584 - 585. In my view, Johnson teaches that when a court assesses whether or not a defendant has committed sabotage, it must look at both the defendant's statements and at the nature of his or her acts to determine state of mind. Where the nature of the acts do not rise to the level of doing damage to the national defense and the defendant knows that the acts cannot rise to this level he or she cannot be said to have intended to injure, interfere with, or obstruct the national defense. With the above principles in mind, I turn again to the facts of the present cases.
 
 
 74
 As described in the testimony in the Holladay case by Dr. Paul Walker, a weapons analyst called by the defense, the Minuteman II launch facility is a largely underground missile system consisting of missiles buried in concrete and steel silos with support facilities buried surrounding them. Each Minuteman II missile is about six feet wide and fifty-eight feet tall, is buried about eighty feet underground, and carries a 1.2 megaton warhead in its nose. We must keep in mind that the explosive force of a 1.2 megaton warhead is roughly the equivalent of two billion pounds of TNT or approximately one hundred times more powerful than the bomb used at Hiroshima. Holladay transcript, Vol. I at 222-33.
 
 
 75
 Each Minuteman II missile is protected in its silo by a concrete lid that weighs more than one hundred tons and is many feet thick. The silos are intended to survive an almost direct nuclear hit--one within one-quarter to one-half mile away. The Minuteman II silos are built to withstand two thousand pounds per square inch of overpressure--four hundred to five hundred times the amount of overpressure than can blow a house off its foundation. Furthermore, the area surrounding each missile site is protected by an elaborate security system. Id.
 
 
 76
 Thus, it can be seen that the efforts of the Kabat defendants, who used a jackhammer at the N5 missile site for less than one-half hour, and the actions of Holladay, who chipped away at the N11 missile silo lid with a star drill and three pound hammer for less than fifteen minutes, did not, and could not, damage or threaten the launch capabilities of the respective missiles.
 
 
 77
 The undisputed evidence as to Holladay discloses that he entered missile site N11 in Missouri at 6:35 a.m. on February 19, 1985, in a show of support for the Kabat defendants who were beginning their trial that day. Minutes after he entered the missile site, military police arrived and spotted him. Holladay had chipped away small pieces of concrete on the top of the silo lid and had poured "blood" on the site. Also, he had tied a sign to some objects near the silo lid which read "swords into plowshares" and had spray painted other slogans on the missile launch facility--"No more Hiroshimas", "Disarm or Dig Graves", and "No".
 
 
 78
 Holladay possessed a written document taken from him at the time of arrest. One side of that document read in part:
 
 
 79
 The legitimacy of law depends upon its foundation or justice. Since the production, deployment and intent to use nuclear weapons so obviously places in jeopardy millions of innocent lives, and ultimately threatens all life on earth, it is the law's duty to uphold rather than hinder acts of disarmament.
 
 
 80
 This principle, which renders nuclear weapons illegal and calls upon people [to] act responsibility to prevent the crimes associated with the production and deployment of nuclear weapons, is reflected in many binding agreements signed by the U.S. government. Although our government does not always live up to its responsibly under International Law, Article VI of the U.S. Constitution states that these international treaties are "the supreme law of the land." Moreover, according to the Principles of the Nuremberg Judgment, individual citizens are to be held responsible for their conduct in perpetrating or failing to prevent crimes of war.
 
 The reverse side read as follows:
 
 81
 This week, Rev. Carl Kabat, Rev. Paul Kabat, Larry Cloud Morgan, and Helen Woodson are on trial in Kansas City for their nonviolent act of disarmament at a Minuteman II silo. In gratitude for their action, which is a challenge to the conscience of each of us, I have come today to offer my own witness for peace.
 
 
 82
 The Minuteman II is an intercontinental missile with a range of 8000 miles. Four hundred of them have been deployed in silos buried in our farmland. Each missile carries a nuclear warhead of 1.2 megatons, equal to 100 times the explosive power of the bomb we used to destroy the city of Hiroshima.
 
 
 83
 A missile silo, it appears, is a pad of concrete behind a chain-link fence. But the reality of that weapon is beyond imagining, a nightmare of melting cities and burning flesh.
 
 
 84
 Sometimes it seems as though we have come to our present state of nuclear insanity in spite of the intent of the American people. We who love our families and our planet surely do not intend the evil that is now being prepared in our name by the weapons scientists and the Pentagon strategists. Yet by our silence and inaction in the face of these weapons, we have all become complicit.
 
 
 85
 A subtle and pervasive terror, which we hesitate even to discuss, steals hope from our children and eats at our very souls.
 
 
 86
 Today I come to this missile silo to offer a small act of disarmament, the dents of a hammer, in the hope of realizing the words of Isaiah:
 
 
 87
 They shall beat their swords into plowshares and their spears into pruning hooks; nation shall not lift up sword against nation, neither shall they learn war any more.
 
 
 88
 (Isaiah 2:4)
 
 
 89
 I act in hope that we renounce military violence to embrace the loving nonviolence of the Gospels:
 
 
 90
 You have heard that it was said: 'You shall love your neighbor and hate your enemy.' But I say to you, Love your enemies and pray for those who persecute you.
 
 
 91
 (Matthew 5:43-44)
 
 
 92
 I act in hope that we might entrust our security not to nuclear weapons, but to the Lord our God.
 
 
 93
 Share your bread with the hungry and bring the homeless poor into your house; when you see the naked, cover him.... Then shall your light break forth like the dawn and your healing shall spring up speedily; ... Then you shall call, and the Lord will answer; you shall cry, and he will say, Here I am.
 
 
 94
 (Isaiah 58:7-9)
 
 
 95
 /s/ MARTIN HOLLADAY
 
 Martin Holladay
 February 1985
 
 96
 Holladay referred to his "act of disarmament" as a "symbolic act," a "witness against nuclear weapons." Holladay transcript, Vol. II at 91, 137. He undertook it in support of the actions of the Kabat defendants. Holladay said that he felt it was his responsibility as a Christian "to shake people awake" to the nuclear threat. Holladay transcript, Vol. II at 83. As shown by the record, Holladay knew full well that he could not actually harm the missile site. Holladay transcript, Vol. II at 92, 142. Thus, considering the nature of Holladay's acts and his statements as a whole, there was insufficient evidence of the necessary intent to injure the national defense to convict Holladay for sabotage.
 
 
 97
 What has been said about Holladay also applies to the Kabat defendants. This group of four committed the acts intended by them. They entered the missile site, pounded on the concrete missile silo lid with a chisel and jackhammer, poured "blood," and unfurled a banner which read "Violence Ends Where Love Begins." But the Kabat defendants possessed no means to hurt the missile's availability or capability for launch. As described in testimony by Dr. Walker in Holladay's trial:
 
 
 98
 you could have a dozen people sit on top of one of these silos with a 50 pound sledge and larger star drill for a week and they would probably not seriously damage the silo. You have got to remember these are intended to survive close to a nuclear--a direct hit at least within a half mile, quarter of a mile to half mile, and there is a lot of difference between someone pounding with a chisel on something like that and a nuclear weapon.
 
 
 99
 Holladay transcript, Vol. I at 225-26.[6] Although the Kabat defendants caused greater damage to the exterior property at the missile silo than Holladay, the quality of the act was similar--symbolic in nature.
 
 
 100
 The Kabat defendants' ultimate desire may be actual disarmament, as is the desire of many people, but their conduct at the N5 missile site could not actually disarm or even affect the missile, and they knew this. The majority mentions statements made by the Kabat defendants that they were attempting "actual disarmament," majority opinion at 585 - 86, yet when the Kabat defendants' words and deeds are considered as a whole, it is clear that their actions were symbolic. They were engaged in a "religious celebration of disarmament" and were attempting to "make a statement that [nuclear] insanity has to cease." Kabat defendants' transcript, Vol. IV at 488, 505. The Kabat defendants expected to be quickly arrested, and tried, and they even carried a press release with them. Thus, as with Holladay's case, the conviction for sabotage against the Kabat defendants must be set aside for insufficiency of the evidence.
 
 III.
 
 101
 At the very least, there needs to be a new trial on the sabotage convictions and those convictions must be set aside at this time for serious errors in the instructions which amount to plain error in this case.
 
 
 102
 In Holladay's trial, the district judge ordered the jury to disregard Holladay's motive, notwithstanding that it is the rule in this circuit that evidence of motive as it bears on intent, may be shown and considered by the jury in its determination of the state of mind or intent of an accused. See United States v. Richmond, 700 F.2d 1183, 1195-96 (8th Cir.1983); United States v. Hammond, 642 F.2d 248, 249-50 (8th Cir.1981).
 
 
 103
 Furthermore, the district judge conducting the Kabat defendants' trial instructed the jury as follows:
 
 
 104
 Good motive alone is never a defense where the act done is a crime. One may not commit a crime and be excused from criminal liability because he desired or expected that ultimate good would result from his criminal act. Moreover, if one commits a crime under the belief, however sincere, that his conduct was religiously, politically or morally required, that is no defense to the commission of a crime.
 
 
 105
 Instruction No. 9. Later, in Instruction No. 29, the district judge further stated:
 
 
 106
 You will not be asked to determine and you should not concern yourself with the purpose or motive of any defendant in doing any act that you find the defendant committed. Under these instructions, you should concern yourself only with determining whether the United States has established beyond a reasonable doubt the essential elements of each offense as to each defendant.
 
 Instruction No. 29.[7]
 
 107
 Similarly, in Holladay's trial, the district judge in effect told the jury to disregard motive without further advising that in sabotage cases, motive, as it bears on intent, may be considered by the jury. The judge instructed:
 
 
 108
 Members of the jury, I have used the word intent in these instructions. I want to explain a little about it. So I instruct you that intent ordinarily may not be proved directly, because there is no way to open up and look into or scrutinize the operations of the human mind. We just can't see into it. But you may infer the defendant's intent from the surrounding circumstances and evidence. You may consider any statements made or done or omitted by the defendant, and all other facts and circumstances in evidence which may indicate his state of mind.
 
 
 109
 Additionally, as noted by the majority, the district judge instructed the jury on several other occasions that it should not consider "good motive." Majority opinion at 584.
 
 
 110
 The error of the instructions on motive in these cases lies in how motive bears on intent under the sabotage statute. Considering that none of the defendants did or could damage the national defense capability of the missile and considering the statements made by the defendants, a jury might well consider the so-called attack on the missile sites as symbolic, that is, as an attempt to publicize their peace views and strong opposition to nuclear weapons, all resting upon religious, moral and humanitarian grounds.
 
 
 111
 The juries were obligated to consider whether the Kabat defendants and Holladay, in fact, intended to injure the national defense by their acts or whether their conduct amounted to a symbolic protest geared to galvanizing the public to action which in the long run might lead to abolition, or, at least, diminishment of nuclear weapons. Whatever defense might exist to the sabotage charges was completely quashed by the trial judges' incomplete, and in the context of this case, unfair instructions which omitted to tell the juries that they could consider defendants' motives as those motives bore on defendants' intent to damage or injure the national defense.
 
 
 112
 The omission to instruct on motive as it bears on intent seems especially egregious in this sort of case. The Government's attorney at oral argument advised us that to his knowledge the present cases represent the first civilian prosecutions under section 2155. I believe the prosecutor overreacted in charging sabotage.
 
 
 113
 Traditionally, in our system, the jury stands as a bulwark to preserve fairness between an all powerful government on the one hand and its citizens on the other.[8] Particularly, in a case of civil disobedience where the government charges sabotage, the jury needs to be told that the commission of the act of destruction of government property, a less serious offense, does not require the jury to convict on sabotage, the more serious offense. These cases disclose at least a mixed motive by the defendants, an illusionary attack on a nuclear weapon and a desire to publicize the suicidal nature for civilization of this ultimate weapon.
 
 
 114
 Recently, this court has overturned two criminal convictions for far less egregious errors in instructions to the jury. United States v. Voss, 787 F.2d 393 (8th Cir.1986); United States v. Ben M. Hogan Co., 769 F.2d 1293 (8th Cir.1985), vacated and remanded, --- U.S. ---, 106 S.Ct. 3325, 92 L.Ed.2d 732, (1986). Here the error affects not the amount of a fine as in Hogan, but means long years of imprisonment for the defendants' acts of civil disobedience. The defendants acted pro se. They did not raise the issue of erroneous instructions on sabotage in each case, but they raised the question of sufficiency of the evidence of sabotage. This is a sufficient attack by pro se litigants for the court to consider all aspects of the sabotage conviction.
 
 
 115
 Because the sabotage convictions apparently have drastically affected the sentences, as an alternative ground of reversal, I would reverse the sabotage convictions for plain error in the instructions, grant a new trial on the sabotage counts, and set aside all the sentences as having been influenced by the sabotage charges and subsequent convictions against all defendants.
 
 IV.
 
 116
 The existence of nuclear weapons and the potential for nuclear war creates political, moral, and religious dilemmas never before confronted by mankind. Each year, the number of bombs has grown, until now between them the United States and the Soviet Union have approximately fifty thousand nuclear warheads. As shown by the record, these weapons expose the world's population to near, if not total, annihilation.[9]
 
 
 117
 Obviously, the direct effects of a nuclear explosion, such as blast, heat and local radioactivity, would be devastating. Furthermore, scientists now theorize that the global environmental effects of nuclear war could bring about a "nuclear winter" that would threaten all human life. Holladay transcript, Vol. I at 232-39.[10] At the very least, all of the effects of nuclear war, including climatic disturbances, radioactive fallout, ozone depletion, the interruption of basic societal services, and other such "indirect effects," would act synergistically with each other to produce unprecedented worldwide human misery. In fact, a recent United Nations report predicts that an all-out nuclear war would kill about four billion people, four-fifths of the world's population, primarily through massive starvation. Mpls. Star and Tribune, May 14, 1986, at 4A.
 
 
 118
 Unfortunately, in the face of this nuclear peril the superpowers seem unable to achieve meaningful nuclear arms control and nuclear arms reduction agreements.[11] It is understandable, then, that various segments of the community have begun to speak out.
 
 
 119
 On May 3, 1983, the National Conference of Catholic Bishops approved a pastoral letter on war and peace. The letter describes the nuclear arms race and nuclear war as a threat to human life and human civilization that is without precedent. In response to this threat the Catholic Bishops urge that:
 
 
 120
 The whole world must summon the moral courage and technical means to say no to nuclear conflict; no to weapons of mass destruction; no to an arms race which robs the poor and the vulnerable; and no to the moral danger of a nuclear age which places before humankind indefensible choices of constant terror or surrender.
 
 
 121
 National Conference of Catholic Bishops, The Challenge of Peace: God's Promise and Our Response 30 (May 3, 1983), reprinted in Origins, NC Documentary Service, Vol. 13, no. 1 (May 19, 1983).[12] More recently, the Methodist Council of Bishops issued an even stronger plea for nuclear arms control. In the introductory pastoral letter to their "Foundation Document" the Methodist Bishops say:
 
 
 122
 We write in defense of Creation. We do so because the Creation itself is under attack. Air and water, trees and fruits and flowers, birds and fish and cattle, all children and youth, women and men live under the darkening shadows of a threatening nuclear winter. We call The United Methodist Church to more faithful witness and action in the face of this worsening nuclear crisis. * * *
 
 
 123
 [W]e say a clear and unconditioned No to nuclear war and to any use of nuclear weapons. We conclude that nuclear deterrence is a position which cannot receive the church's blessing.
 
 
 124
 Methodist Council of Bishops, In Defense of Creation: The Nuclear Crisis and a Just Peace 2 (May 2, 1986) (pastoral letter).[13]
 
 
 125
 Furthermore, many ordinary citizens, in groups and individually, through their words and their deeds, are demanding an end to the stockpiling of more and more nuclear bombs. For example, in my home state, North Dakota, a substantial majority of the citizenry recently passed a referendum calling on the President of the United States to propose to and to negotiate with the Soviet Union and other nations an immediate, mutual and verifiable end to the production, testing, and further deployment of nuclear weapons.[14] In a related fashion, more than one hundred communities in this country, through resolutions and petition initiatives, have called for a ban on nuclear weapons within their locales. Bombs away!, 72 A.B.A.J. 27 (May 1, 1986).
 
 
 126
 The actions of the Kabat defendants and Holladay constitute part of the growing clamor against the nuclear threat. Through their dramatic act of civil disobedience, the Kabat defendants and Holladay seem to have sacrificed their own freedom in hopes of awakening the public to the grave danger of nuclear annihilation. For that sacrifice, I doubt that they should be labelled as arrogant individuals. See Majority opinion at 583 - 584, 587.
 
 
 127
 We must recognize that civil disobedience in various forms, used without violent acts against others, is engrained in our society and the moral correctness of political protestors' views has on occasion served to change and better our society. Civil disobedience has been prevalent throughout this nation's history extending from the Boston Tea Party and the signing of the Declaration of Independence, to the freeing of the slaves by operation of the underground railroad in the mid-1800's. More recently, disobedience of "Jim Crow" laws served, among other things, as a catalyst to end segregation by law in this country, and violation of selective service laws contributed to our eventual withdrawal from the Viet Nam War.
 
 
 128
 In these circumstances, the courts in assessing punishment for violation of laws have ordinarily acted with a degree of restraint as to the severity of the punishment, recognizing that, although legally wrong, the offender may carry some moral justification for the disobedient acts. What has distinguished our society from other countries whose governments are described as repressive is that our government has been able to limit its response to this sort of protest which, it must be specifically noted, is nonviolent as to persons.
 
 
 129
 This court, in an earlier day, dealt with a problem akin to that which is before us now. In United States v. Achtenberg, 459 F.2d 91, 100 (8th Cir.), cert. denied, 409 U.S. 932, 93 S.Ct. 229, 34 L.Ed.2d 187 (1972), a panel of this court, in an opinion authored by one of our great modern judges, the late Martin Van Oosterhout, granted a new trial to a Viet Nam War protestor who had been charged with sabotage for his alleged participation in starting a fire in the Army ROTC building at Washington University in St. Louis, and had been sentenced to fifteen years in prison. This court held that the failure to supply the defendant with a grand jury transcript, the improper argument of the prosecutor to the jury, and the improper instructions provided to the jury each constituted prejudicial error. Id. at 95-100. In my view, a reading of the case shows that the Achtenberg panel in considering this act of civil disobedience held the prosecutor and the trial judge to very exact standards.
 
 
 130
 I believe that similar exact standards must apply in this case, particularly because it represents the first application of the sabotage statute to peacetime civil disobedience in opposition to nuclear weapons. As undergirding to these exact standards, we need carefully consider the nature of the protest. Along those lines, Father Henri J.M. Nouwen, a priest of the Roman Catholic archdiocese of Utrecht, in Holland, recently wrote:
 
 
 131
 The small groups of "disobedient" people who here and there jump the fences of nuclear weapons facilities, climb on board nuclear submarines, or put their bodies in front of nuclear transports are trying to wake us up to a reality we continue to ignore or deny. * * * Their loud, clear and often dramatic no has to make us wonder what kind of no we are called to speak.
 
 
 132
 Nouwen, Prayer and Resistance: A Spirituality of Peacemaking, Harvard Divinity Bulletin 5, 7 (October-November 1985) (emphasis in original).
 
 V.
 
 133
 For the foregoing reasons, I would reverse and vacate the convictions for sabotage and direct that the lengthy prison sentences imposed on the Kabat defendants and Holladay be vacated in light of the reversal of the sabotage counts and that the offenders be resentenced for their crimes against government property without consideration of the vacated sabotage counts.
 
 ORDER DENYING PETITION FOR REHEARING
 
 134
 The petition for rehearing before the court en banc is denied. Chief Judge Law, Judges Heaney and McMillian vote for a rehearing en banc. Judges Ross, Arnold, John R. Gibson, Fagg, Bowman, Wollman and Magill vote to deny said petition.
 
 
 135
 The petition for rehearing by the panel is also denied. Senior Circuit Judge Bright would grant the rehearing by the panel.
 
 ADDENDUM
 
 136
 The majority of the panel (Senior Circuit Judge Bright and Circuit Judge Wollman) make the following statement relating to the denial of the petition for rehearing by the panel:
 
 
 137
 Although the severity of sentences imposed by the sentencing judge was not before the court on the appeal, the undersigned note their concern that the sentences imposed on these defendants' [Father Paul Kabat, Father Carl Kabat, Lawrence Jacob Cloud-Morgan and Helen Woodson] may be heavier than sentences imposed in other cases on somewhat similar offenders.
 
 
 138
 We are also aware that in subsequent missile protest cases in the Western District of Missouri the prosecution has not charged those defendants, similarly situated to these defendants, with sabotage. Additionally, we have received information that in the companion nuclear protestor case, the sentencing judge, Hon. Elmo B. Hunter, has reduced the sentence of Martin John Holladay to time served (seventeen months) from the initial sentence of eight years' imprisonment.
 
 
 139
 In light of the changed circumstances, we suggest that the sentencing judge consider reduction of the prison sentences previously imposed on these defendants, but add to any reduced sentence a period of probation to be subject to the court's specific order and condition that the defendants may be reincarcerated if they engage in any further unlawful activities.
 
 
 140
 Judge Bowman does not join in the foregoing statement and adds a separate statement as follows:
 
 
 141
 As my colleagues on the hearing panel note, the sentences imposed on these defendants have not been raised as an issue on this appeal. Thus we have not had the benefit of any briefing or argument on this issue. We are totally in the dark concerning the information that was before the District Court at the time of sentencing, including information concerning the risk to national security that these defendants created by their attack on a nuclear missile silo. As a result, we are in no position to second-guess the sentencing judge.
 
 
 142
 The tenor of my colleagues' statement nevertheless will lead readers to conclude that the Court believes the sentences are too heavy and ought to be reduced. Yet it remains that the "changed circumstances" my colleagues rely upon are outside the record and beyond the issues presented to us. With all respect, I believe my colleagues prematurely and inappropriately have expressed their views on an issue that has not been presented to us and as to which we lack knowledge sufficient to provide a basis for informed opinion. Since this issue may yet come before us, it is regrettable that we create the impression we have prejudged it. Accordingly, I decline to join in my colleagues' statement.
 
 
 
 [1]
 The Honorable D. Brook Bartlett, United States District Judge for the Western District of Missouri
 
 
 [2]
 The district court also noted the violent and intentional nature of the destruction, the past criminal records of the defendants, and the assertions of the various N5 defendants that they would possibly, likely, or even certainly commit similar acts at other missile sites in the future
 
 
 [3]
 Woodson withdrew her notice of appeal, so her fate is not at issue here. We observe, however, that, pursuant to Rule 35 of the Federal Rules of Criminal Procedure, the district court on November 1, 1985, reduced Woodson's consecutive sentences to six years each (the sentences on the other counts remained unchanged). The court based its action on a Parole Commission ruling as to the severity of the offenses that would have resulted in Woodson being incarcerated longer than the district court had anticipated
 
 
 [4]
 The Honorable Elmo B. Hunter, Senior United States District Judge for the Western District of Missouri
 
 
 [5]
 The government in regard to this and the international law issue asserts that the N5 defendants are not entitled to relief absent plain error because of their failure to object or to offer an appropriate instruction respectively. Fed.R.Crim.P. 30; see, e.g., Barnes v. United States, 777 F.2d 430, 431 (8th Cir.1985); United States v. Jackson, 714 F.2d 809, 813 (8th Cir.1983); United States v. Joyner, 539 F.2d 1162, 1166 (8th Cir.), cert. denied, 429 U.S. 983, 97 S.Ct. 499, 50 L.Ed.2d 593 (1976). We observe that we are in the habit of granting indulgence to persons proceeding pro se, cf. O'Blasney v. Solem, 774 F.2d 925, 926 (8th Cir.1985) (pro se petition for habeas corpus to be read with indulgence); Williams v. Lockhart, 772 F.2d 475, 480 (8th Cir.1985) (claim taken as raised where, while not mentioned in the original petition, it was addressed in detail in subsequent filings); Munz v. Parr, 758 F.2d 1254, 1258 (8th Cir.1985) (pro se complaint to be liberally construed); and the record shows that the district court was clearly aware of the defendants' theories of their cases. See United States v. Earley, 746 F.2d 412, 414 (8th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 2707, 86 L.Ed.2d 723 (1985); cf. United States ex rel. Means v. Solem, 646 F.2d 322, 328 (8th Cir.1980) (request for instruction incorrectly stating law was sufficient to put court on notice to give a proper instruction on the issue). Given our outcome, we may assume without deciding that the N5 defendants' international law and instructional objections thus are properly before us. (Furthermore, we must reach the international law defense anyway as to Holladay.)
 
 
 [6]
 The court at the trial of the N5 defendants offered no definitions
 
 
 [7]
 The defendants assert that the "national defense" extends only to weapons with "defensive," as compared to "offensive," uses. We conclude, however, that for the purpose of defining the offense included within section 2155, weapons systems cannot be so neatly categorized
 
 
 [8]
 Section 2153(a) provides:
 Whoever, when the United States is at war, or in times of national emergency as declared by the President or by the Congress, with intent to injure, interfere with, or obstruct the United States or any associate nation in preparing for or carrying on the war or defense activities, or, with reason to believe that his act may injure, interfere with, or obstruct the United States or any associate nation in preparing for or carrying on the war or defense activities, willfully injures, destroys, contaminates or infects, or attempts to so injure, destroy, contaminate or infect any war material, war premises, or war utilities, shall be fined not more than $10,000 or imprisoned not more than thirty years, or both.
 While the presence in section 2153 of a "reason to believe" clause absent in section 2155 might be relevant in cases, such as Johnson, where defendants act without conscious reflection on the implications of their conduct for national defense, this is not, as we developed earlier, the situation here.
 
 
 [9]
 Furthermore, the statutory construction urged by defendants would withdraw the sanction of sabotage from conduct of others than political dissenters. For example, a person who knew no allegiance or animosity other than personal gain could engage in the same acts as these nuclear protesters, consciously interfering with national defense property, but for money, and would be guilty of no greater crime than destruction of government property despite the government's greater interest in preserving the integrity of its military establishments and defense systems
 
 
 [10]
 Instruction 9 in full read as follows:
 Good motive alone is never a defense where the act done is a crime. One may not commit a crime and be excused from criminal liabiltiy [sic] because he desired or expected that ultimate good would result from his criminal act. Moreover, if one commits a crime under the belief, however sincere, that his conduct was religiously, politically or morally required, that is no defense to the commission of a crime.
 
 
 [11]
 The defendants, at least in their initial briefs, attempt to draw from the German jurists case an alternate basis, other than the need to avoid personal sanctions, for the privilege to act to prevent violations of international law. They argue that the German jurists' war crimes lay in their failures to allow dissidents at their trials in Nazi courts to assert international law defenses to charges of interfering with Nazi extermination policies. Thus, the defendants reason, they, like the prosecuted German dissidents, were entitled to assert privileges to prevent violations of international law at their trials in domestic courts even though they otherwise faced no obligations to participate in their country's crimes against humanity. We suggest, however, that a more proper interpretation of the German jurists' case identifies the jurists' war crimes as the imposition of harsh penalties, such as death sentences, on dissidents; the conduct of repeated trials for the same offenses; the holding of secret trials; the predetermination of sentences; the use of discriminatory trial procedures; and the denial of the right to appeal and the opportunity to file civil suit. See 3 Trials of War Criminals, supra, at 19-25
 
 
 [1]
 The Kabats, Cloud-Morgan, and Woodson call themselves the "Silo Pruning Hooks," taken from the words of Isaiah in the Old Testament:
 They shall beat their swords into plowshares, and their spears into pruning hooks; nation shall not lift up sword against nation, neither shall they learn war any more.
 Isaiah 2:4.
 
 
 [2]
 The arguments raised by the Kabat defendants and Holladay regarding international law, the judgments at Nuremberg, and the defense of necessity present certain difficulties. Although I do not necessarily agree with the majority's analysis, I believe that under the particular facts and circumstances of these cases the district courts did not err in their treatment of these defenses
 
 
 [3]
 At oral argument, counsel for the Kabat defendants and Holladay advised the court that Woodson withdrew her notice of appeal because she felt that her heavy sentence should be a matter for the conscience of the sentencing judge. We have been advised that the trial judge on November 1, 1985, reduced this sentence to twelve years' imprisonment--still a very heavy penalty. See Majority opinion at 583 n. 3
 See also McGrory, Saga of an American Dissenter, Wash. Post, April 15, 1986, at A2.
 
 
 [4]
 I am aware that Chief Judge Miles Lord of the United States District Court for the District of Minnesota (now retired) sentenced John Michael LaForge and Barbara Ann Katt, who were convicted under 18 U.S.C. Sec. 1361 (1982) for their protest activity at Sperry, Inc., to six months probation. United States v. LaForge and Katt, Cr. 4-84-66, slip at 20 (D.Minn. November 8, 1984) (sentencing). LaForge and Katt caused approximately $36,000 damage by hammering and pouring blood on computer parts that Sperry was assembling for the United States military. That is about $7,000 more damage than was caused by the Kabat defendants and eighteen times more than was caused by Holladay
 At the sentencing of LaForge and Katt, Chief Judge Lord commented in part:
 As I ponder over the punishment to be meted out to these two people who were attempting to unbuild weapons of mass destruction, we must ask ourselves:
 Can it be that those of us who build weapons to kill are engaged in a more sanctified endeavor than those who would by their acts attempt to counsel moderation and mediation as an alternative method of settling international disputes?
 Why are we so fascinated by a power so great that we cannot comprehend its magnitude? What is so sacred about a bomb, so romantic about a missile?
 Id. at 14-15.
 
 
 [5]
 At oral argument, counsel for the Kabat defendants and Holladay advised the court that his clients had not wanted to raise any "technical, legal defenses," and that they specifically rejected a challenge to the length of their sentences. Presumably, the Kabat defendants and Holladay believed, similar to Woodson, that their sentences should rest on the conscience of the trial judges
 
 
 [6]
 Although Dr. Walker testified only in the Holladay trial, the Government made no claim of damage to the launch capability of the missile or the destructive potential of the bomb within. I believe that we can take judicial notice that the sites are extremely secure from damage
 
 
 [7]
 The district judge conducting the Kabat defendants' trial also instructed the jury as follows:
 The crime of interfering with the national defense of the United States as charged in Count III of the Indictment has three essential elements. You must consider these elements separately for each defendant. In order to find a defendant guilty of interfering with the national defense, the United States must establish each of the following elements beyond a reasonable doubt as to that defendant:
 FIRST: That missile launch facility N5 is an installation of the United States Air Force or that the equipment located thereon was suitable for use by the United States in connection with the national defense; and
 SECOND: That on or about November 12, 1984, the defendant voluntarily and intentionally injured or destroyed or attempted to injure or destroy missile launch facility N5 or the equipment thereon; and
 THIRD: That the defendant did the act described in paragraph Second with the intent to injure, interfere with, or obstruct the national defense of the United States.
 Instruction No. 21.
 For reasons stated in the text, the correctness of this instruction could not overcome the extreme prejudice to the defense resulting from Instructions No. 9 and No. 29.
 
 
 [8]
 See United States v. Dougherty, 473 F.2d 1113, 1142 (D.C.Cir.1972) (Bazelon, C.J., concurring) ("The very essence of the jury's function is its role as spokesman for the community conscience in determining whether or not blame can be imposed"); see also Torres & Brewster, Judges and Juries: Separate Moments in the Same Phenomenon, 4 Law & Inequality 171, 188 (1986) ("The deference the law gives to the jury as a guardian of our liberties and as a protector against the state's excesses reflects its majesty. A jury accepts power from the state in order to control the power of the state.")
 
 
 [9]
 See J. Schell, The Fate of the Earth (1982) (containing an excellent and important discussion regarding the effects of nuclear war)
 
 
 [10]
 See Turco, Toon, Ackerman, Pollack & Sagan, Nuclear Winter: Global Consequences of Multiple Nuclear Explosions, Science 1283 (December 23, 1983)
 Although recent scientific studies may have somewhat tempered the worst nuclear winter scenarios, we are still talking about degrees of horror on a scale that is almost inconceivable. See Thompson & Schneider, Nuclear Winter Reappraised, 64 Foreign Affairs 981 (Summer 1986).
 
 
 [11]
 See, e.g., N.Y. Times, June 8, 1986, Sec. 4, at 1, col. 4 (discussing President Reagan's statement of intention to scrap the 1979 SALT II accords because of perceived Soviet violations); McNamara, 15 Years of Arms Control Demolished, N.Y. Times, June 8, 1986, Sec. 4, at 23, col. 2 ("If President Reagan implements his decision to abandon SALT, the superpowers will intensify an arms race that is far worse than anyone would have dared to predict at the dawn of the atomic age."). But cf. N.Y. Times, July 6, 1986, Sec. 4, at 1, col. 4 (discussing the possibility of a summit meeting between President Reagan and Mikhail S. Gorbachev, the Soviet leader, and quoting President Reagan as being "optimistic" on nuclear arms control)
 
 
 [12]
 The text of the Catholic Bishops' pastoral letter has been made part of the record
 
 
 [13]
 I take judicial notice of the contents of this letter and the existence of scientific writings and other material and data relating to nuclear weapons. See In re Ahlers 794 F.2d 388, 393 n. 1 (8th Cir.1986), and citations therein. We cite these matters in this opinion not for their truth or accuracy, but for the limited purpose of recognizing the existence of these views on the highly volatile subject of nuclear weapons
 
 
 [14]
 The referendum read as follows:
 LIMITS ON NUCLEAR WEAPONS
 An initiated measure to request the President of the United States to propose to and to negotiate with the Soviet Union and other nations an immediate, mutual and verifiable end to the production, testing, and further deployment of nuclear weapons.
 BE IT ENACTED BY THE PEOPLE OF THE STATE OF NORTH DAKOTA:
 SECTION 1. INTENT. It is the intent of the electors of the state of North Dakota to contribute to the termination of the nuclear arms race among nations, and to reduce the risk of nuclear war for all people, whether such nuclear war is started by accident or decision.
 SECTION 2. MESSAGE TO THE PRESIDENT OF THE UNITED STATES. Prior to January 15, 1983, the Governor shall send a message to the President of the United States requesting the President to propose to and to negotiate with the Soviet Union and other nations an immediate, mutual and verifiable end to the production, testing, and further deployment of nuclear weapons.
 SECTION 3. EFFECTIVE DATE. The effective date of this Act shall be January 1, 1983.
 Approved November 2, 1982
 NOTE: This was measure No. 7 on the general election ballot. Chapter 716 (Initiated Measures Approved).